MARYLAND – NATIONAL CAPITAL PARK AND PLANNING COMMISSION a public body corporate, Appellant.

v.

U. S. POSTAL SERVICE.

No. 72–2126.

United States Court of Appeals, District of Columbia Circuit.

Argued May 31, 1973.

Decided Aug. 23, 1973.

David D. Freishtat, Baltimore, Md., for appellant.

Henry J. Bourguignon, Atty., Dept. of Justice, with whom Kent Frizzell, Asst. Atty. Gen. and Thomas L. McKevitt, Atty., Dept. of Justice, were on the brief for appellee.

Before DANAHER, Senior Circuit Judge, and McGOWAN and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This appeal is taken from the District Court's denial of a preliminary injunction in a suit by the Maryland-National Capital Park and Planning Commission to stop continued construction of the Washington Bulk Mail Center now under construction on a 63-acre tract in Prince George's County, Maryland, adjacent to the west side of the Capital Beltway, a major divided highway. The site already contained significant industrial development. On the southern border was a PEPCO power line, to the north a large Coca Cola bottling plant, and shopping center. Appellant claims that the Post Office was required to file an environmental impact statement pursuant to the requirements of the National Environmental Policy Act of 1969 (NEPA). Jurisdiction is properly taken under 28 U.S.C. § 1292(a)(1). We do not reverse the denial of the preliminary injunction that has been appealed, but believe that the case calls for a remand to consider the matters identified in our opinion.

I. STATEMENT OF FACTS

Early in 1970, the Post Office Department began formulating specific plans for site acquisition and construction of the Bulk Mail Facility. In November of the same year, the Post Office referred its plans for the building project to the National Capital Planning Commission (NCPC) for approval pursuant to the provisions of 40 U.S.C. § 71d, which generally provides for "comprehensive planning and orderly development of the National Capital", for advance submission by a Federal Agency "of plans and programs in preliminary and successive stages which affect the plan and development of the National Capital." The statute does not require Commission approval before action is taken, but it does contemplate consideration of the report and recommendations of the Commission. Specifically, when development plans require the acquisition of land, plans must be submitted "to the Commission for report and recommendations before final commitment to said acquisition, unless such matters shall have been specifically approved by Congress." The Commission, in turn consults with "the appropriate planning agency having jurisdiction over the affected part of the environs", in this case the appellant, Maryland-National Capital Park and Planning Commission (MNCPC).

Following referral from NCPC, MNCPC offered its views on the proposed project by Resolution adopted De-

cember 23, 1970. This Resolution based its conclusion on a review of the project by the Prince George's County Planning Board, and disapproved the proposed location as well as the Preliminary Master Plan for the Facility. While the "overriding issue" underlying the rejection was "social and economic", rooted in the prospective loss of real and personal property taxation, the Resolution also called attention to other undesirable effects of the plan: (1) the uncertain state of authorization for water and sewer service, (2) increased traffic in the area, (3) inadequate provision for a storm-water and oil run-off, and (4) "visual and aesthetic detriment" connected with the placement near the Beltway of exterior parking and loading facilities. The proposed facility was to be placed in I–1 and I–3 zoning, as part of an industrial park. Twenty-five of the 63 acres were zoned I–3, which included a 500 foot-wide strip along the Beltway to be used by the Department, later to become the Postal Service. The NMCPC concluded that "[t]he proposed bulk mail facility is a permitted use" in both zones, since permitted uses included a "[p]ublic building where owned and/or operated by a government agency."

Despite the fact that the facility was thought to be a "permitted use" by the Board, it noted in its conclusions and recommendation:

> The proposed facility is not wholly in conformance with either the intent of the I–3 zone ordinance to encourage high-quality industrial uses, or the intent of the establishment of a 500-foot strip of I–3 zoning along the Beltway. Good visibility, prestige location and other related factors were not indicat-

ed as necessary for this facility by the Post Office.

On March 4, 1971, the NCPC approved the "general location, character, extent and intensity of use for the Facility" provided, however, that the site be moved out of the I–3 zone and located entirely within the I–1 zone. In conditioning approval on the site change, primary concern was with the use of 500-foot wide strip of I–3 zoning along the Beltway. The NCPC repeated the objections of the Prince George's Planning Board that this space was intended to be reserved for "high quality industries on campus-like settings."

A summary and over-simplified statement of I–1 and I–3 zoning appears in footnote *.

The NCPC also requested that consideration continue to be given to oil and water run-off, landscaping of the loading and docking areas, and housing and related public facilities for new employees of the Post Office who would become residents of the area.

On or about May 6, 1971, the Post Office agreed to change the location of the Facility. As described by NCPC, in a Report of the Federal Planning and Projects Committee, "[t]he proposed site is 500 feet west of the Capital Beltway within the Hampton Industrial Park and the I–1 zone, except approximately seven acres currently designated RR (Rural Residential). However, the proposed development is a use permitted in the RR zone under the county's Zoning Ordinance." This change in location satisfied the condition made part of the NCPC approval of March 4.

At this point of the factual background, the record is unclear.[1] In Octo-

---

* We write with a necessarily sketchy understanding, since the record does not contain a clear cut statement of the differences between I–1 and I–3 zoning, in terms of either formal wording or customary application. In general, I–1 zone relates to "light industrial use"—subject to a long list of exemptions prohibiting specific uses. The I–3 zone relates to in-

dustrial use within a planned industrial park and is limited to uses set forth in the zoning ordinance, unless variance is permitted by county authority.

1. During this same period the Post Office Department was in a period of transition. Congress by Act of August 12, 1970, 84 Stat. 719, 39 U.S.C. § 101 *et seq.*, created

ber 1971, the grading and foundation contract was awarded by the Post Office. However, evidently at some time between May 6 and October, the Postal Service decided to revert to its prior plan to use I–3 zoning along the Beltway. As a matter of record, this first came to light when the Post Office, on July 12, 1972, submitted to NCPC its preliminary site and building plans. By this time work had already begun on grading and foundation. The justification for the use of the I–3 zone was made a part of this July 12 submission, and was based on a study by consultants for the Post Service, Giffels Associates, and U. S. Corps of Engineers (the building agent of the Post Office).

Giffels concluded, contrary to the assertion of the NCPC Committee on May 6, 1971, that a move westerly to the RR zone would require a re-zoning. Giffels also concluded that such a move had design disadvantages, and would have required the destruction of several acres of natural wooded area. Their proposal was, therefore, to remedy the visual problem posed by use of the I–3 zone by significantly increasing the landscaping plans and budget. The submission to NCPC also included an environmental assessment, taken from the Giffels study, from which the Corps of Engineers concluded that it was not necessary to prepare a full environmental impact statement.

The "assessment" dealt with a number of potential environmental impacts from the project, but found that all potential impacts had been obviated by design characteristics of the project. It noted that there would be landscaping for aesthetic effect; control of emissions of Postal Service vehicles by use of the "California Control Package;" purchase of nonleaded gasoline, if necessary; retention of natural vegetation where possible; and treatment of detergent water in sanitary sewers.

As to the potentially significant problem of water run-off, the assessment indicated the following:

The project will incorporate a controlled run-off system based on the ponding of rain water on the roof . . . thus reducing the discharge rate and, in turn, minimizing the effect of discharge when it is released during times when natural precipitation is not causing stress.

On August 3, 1972, the NCPC took no action on the revised site boundaries, deferred action on the preliminary site and building plans, and requested that the Postal Service provide additional information on "environmental impact." Clarification was sought as to how a sanitary sewer service was to be provided, and revisions of the plan were requested to provide for "an on-site storm water impounding and screening facility and runoff from truck and automobile parking areas to avoid flooding and pollution of nearby streams," traffic congestion, and economic problems connected with the influx of new employees.

This information was submitted to NCPC on August 16, 1972, and, as relevant here, began with a discussion of the water run-off. The report analyzed the problem on the assumption, as indicated in its prior report, that there would be a "controlled run-off feature" on the Process Building Roof. Concentrating on possible flood damage, due to estimated quantities of run-off, the report thought that the damage would be minimal and no measurable benefits would be derived from impounding the storm water.

As to the removal of oil from parking lot run-off, the study stated it would be a "next to impossible task." Giffels stated that "[t]he only known method is to retain all storm water for a sufficient period of time to allow oils to rise to the surface in a quiescent area and remove by either skimming, screening or suction devices. These devices would be highly

the United States Postal Service as a semi-independent government corporation. The

changeover was not completed until July 1, 1971.

unsatisfactory since the oils do not exist in sufficient quantities to make any of the systems feasible." The report also noted that landscape problems would arise from any attempt to design ponds to deal with either the storm water or oil run-off problems. Information, of a supplementary but not critical nature, was presented on the other areas as required by NCPC.

On September 7, 1972, NCPC gave its approval to the preliminary site and building plans, and, thus, for the first time approved the use of the I-3 zone along the Beltway. As part of the ongoing process, however, that Commission requested that the Corps of Engineers and the Postal Service continue to work on obtaining sewer service, to provide a landscaped impounding and oil screening facility, and to minimize the impact of necessary employee transfers and resident relocation.

The District Court, 349 F.Supp. 1212, denied the motion for preliminary injunction on October 13, 1972. Oral argument on appeal was heard on May 31, 1973. Subsequent to oral argument, the Postal Service lodged with us a status report on the progress of construction of the project. Phase I and II of construction are totally complete, and Phase III, the general contract, was 32% complete, as of May 16, 1973. The three contracts for the Bulk Mail Center total $26 million in value. Based on contractor earnings the structure itself is approximately 60% complete; the total work including installation of Government Furnished Property (Mechanization) is approximately 45% complete. It was represented to us at oral argument by the attorney for the Postal Service, that a sewer connection was no longer a problem, since the Government had obtained a hook-up on March 15, 1973.

## II. LEGAL ISSUES

The issue for decision in this case is whether the district judge improperly denied appellant's requested preliminary injunction. This in turn comprehends an assessment of the issue posed by plaintiff's claim that the Postal Service was required to file a detailed impact statement pursuant to § 102(C) of NEPA.

This court ordinarily will not disturb the order of the District Court except for abuse of discretion or clear error, Southern Ry. Co. v. Brotherhood of Locomotive Firemen & Engineers, 127 U.S.App.D.C. 371, 374, 384 F.2d 323, 326 (1967), and we do not consider the merits of the case further than necessary to determine whether that discretion was abused. Young v. Motion Picture Association of America, Inc., 112 U.S.App.D.C. 35, 299 F.2d 119, cert. denied, 370 U.S. 922, 82 S.Ct. 1565, 8 L.Ed.2d 504 (1962). We must, however, determine first, whether appellants are likely to prevail on the merits, Virginia Petroleum Jobbers Ass'n v. FPC, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958), and second, we must determine the possible irreversible harm which might flow from the denial, see Businessmen Affected By the Second Year Action Plan v. District of Columbia Redevelopment Land Agency, 143 U.S.App.D.C. 161, 442 F.2d 883 (1971). The issue on the merits is whether the Postal Service "unreasonably" or "arbitrarily" failed to file an environmental impact statement, required by § 102 of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332 (1970) for "major Federal actions significantly affecting the quality of the human environment." The relevant harm is to the environment from allowing the Bulk Mail Facility to be completed.

We proceed to examine four specific issues; the relationship between NEPA and local zoning, the importance of esthetic considerations, criteria for assessing need for an impact statement in matters pertaining to health and natural resources, and remedies available at an advanced stage of project construction, for failure to file an impact statement.

### A. *NEPA and Deference to Local Zoning*

The agency action to be specifically reviewed is the decision of the Postal

Service, acting through its agent the Corps of Engineers, not to file a detailed impact statement.

In considering this decision, based on submissions by the Postal Service to NCPC, including the "assessment" statement prepared by the Corps of Engineers, the critical questions revolve around the import of the terms "significantly" and "quality of the human environment", as used in § 102(2)(C). It is we think fairly conceded by both parties that this is a "major Federal action." [2]

The question of significance takes on a distinctive cast in the context of land-use planning. We think that much may turn on whether the Federal Government conforms to or deviates from local or regional regulations of land use. *Compare* Hanly v. Kleindienst II, 471 F.2d 823, 830–831 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).[3] The policy goals of NEPA are to be achieved "in cooperation with State and local governments." Section 101(a), 42 U.S.C. § 4331(a).

When local zoning regulations and procedures are followed in site location decisions by the Federal Government, there is an assurance that such "environmental" effects as flow from the special uses of land—the safety of the structures, cohesiveness of neighborhoods, population density, crime control, and esthetics—will be no greater than demanded by the residents acting through their elected representatives. There is room for the contention, and there may even be a presumption, that such incremental impact on the environment as is

2. Section 102(2)(C), 42 U.S.C. § 4332(2)(C) provides:

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes.

3. *See also* Hiram Clarke Civic Club v. Logan, 476 F.2d 421 (5th Cir. filed April 3, 1973), where injunctive relief denied on basis of NEPA claim against construction of a proposed low and moderate income apartment project in Houston, Texas. The Court noted that "Appellants, homeowners in the immediate area surrounding the site of the proposed apartments, initially opposed the project through local zoning boards and other governmental [bodies without success]." 476 F.2d at 423. In Ely v. Velde, 451 F.2d 1130 (4th Cir. 1971), an action to compel a NEPA statement was successful where construction and funding of a Medical and Reception Center for Virginia prisoners was proceeding in the Green Springs area of Louisa County, a rural community, "uniquely historical and architecturally significant," and essentially represented a non-conforming use.

A NEPA statement was also required in Goose Hollow Foothills League v. Romney, 334 F.Supp. 877, 879 (D.Or.1971) where a high rise apartment building was to be constructed in the Goose Hollow area of Portland, where there were until that time no high rise buildings. *But see* Town of Groton v. Laird, 353 F.Supp. 344, 350 (D. Conn.1972), "NEPA is not a sort of meta-zoning law . . . NEPA may not be used by communities to shore up large lot and other exclusionary zoning devices that price out low and even middle income families."

attributable to the particular land use proposed by the Federal agency is not "significant," that the basic environmental impact from the project derives from the land use pattern, approved by local authorities, that prevails generally for the same kind of land use by private persons.

■■ When, on the other hand, the Federal Government exercises its sovereignty so as to override local zoning protections, NEPA requires more careful scrutiny. NEPA has full vitality, and its policies cannot be taken as effectuated by local land use control, where the proposal of the Federal Government reflects a distinctive difference in kind from the types of land use, proposed by private and local government sponsors, that can fairly be taken as within the scope of local controls. The same considerations may apply where there are differences in degree so great as to make a difference in kind, or where potential environmental effects extend geographically beyond the control on one independent local or regional government. For example, whereas the Federal Government might legitimately defer to New York City zoning in matters of, say, population density, a different issue would be posed by the location within the city of an atomic reactor. Its peculiar hazards would not be limited to the citizens of New York, nor could they be controlled by them.

On the facts of this case, we are presented with conformity to the "Permitted Uses" of the zoning, but with a potential override, through reliance on Federal sovereignty, of local procedures used to control such uses. While the 1970 Resolution of MNCPC opposing this project concluded that "[t]he proposed bulk mail facility is a permitted use" because it was the Government that was involved, it plainly noted that the I–3 zone ordinance did not contemplate the type of use here undertaken. More

importantly, counsel at oral argument represented to us that I–3 zoning uses generally require site plan supervision by Prince George's County. This type of control was not exercised here because the only input the County could make was to NCPC, and the Postal Service was not even bound to follow the NCPC conditions or requests. The Federal Government was able to avoid the potential veto by Prince George's County over the comparable proposed use of I–3 zoning by a private developer.

■ Still another qualification must be added, however, to our analysis. Not all deviations from local zoning will necessarily rise to the level of affecting the "quality of human environment" within the fair meaning of that term. The "over-riding" issue underlying MNCPC's recommended rejection of this project was "social and economic" and as we observed, rooted in the prospective loss of real and personal property taxation. A secondary, and related factor, was the prospect of an influx of low-income workers into the County. Concerned persons might fashion a claim, supported by linguistics and etymology, that there is an impact from people pollution on "environment," if the term be stretched to its maximum. We think this type of effect cannot fairly be projected as having been within the contemplation of Congress. See Town of Groton v. Laird, 353 F.Supp. 344 (D.Conn. 1972), *supra* note 3. The indication that this concern perhaps provided the impetus to Prince George's County in raising other, and more legitimate, potential environmental impacts, does not disqualify their legal claims, but is not entirely unrelated to the kind of assessment of the equities that must be taken into account in review of the denial of the preliminary injunction.

■ Having expressed our view that we should carefully scrutinize this decision, and engage in a "hard look"[4] at

---

4. Greater Boston TV (I) v. FCC, 143 U.S. App.D.C. 383, 444 F.2d 841 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L. Ed.2d 701 (1971). We think the same approach is indicated by the "substantial inquiry" formulation of the Supreme Court in

the decision not to file an impact statement, due to deviation from local zoning procedures, while restricting our consideration to legitimate environmental effects, we turn to the possible significant adverse impact present in this case.

### B. *NEPA and Esthetics*

First, we deal with esthetic questions. Primarily this has to do with the visual effect of the Facility on the users of the Beltway.[5] In particular, concern was voiced by NCPC during its successive stages of review of the project that there be landscaping of the loading and docking areas. Also the question of visual effect was partly responsible for the NCPC condition in 1971 that building be removed from the I–3 zone contiguous to the Beltway in order that this area be reserved for "high quality industries on campus-like settings."

■ NEPA contemplates that esthetic considerations are part of the quality of the human environment. Section 101(b)(2) provides that it is Federal policy to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings." This language was taken from the Senate version of the Bill, in Conference, H.Rep. No. 91–765, 91st Cong., 1st Sess. 8 (1969), U.S.Code Cong. & Admin.News 1969, p. 2751. The Senate Report No. 91–296, 91st Cong., 1st Sess. 18 stated: "Each individual should be assured of safe, healthful, and productive surroundings in which to live and work and should be afforded the maximum possible opportunity to derive physical, esthetic, and cultural satisfaction from his

environs." And esthetics have played a part in court protection of environmental values even prior to NEPA, as appears from Scenic Hudson Preservation Conf. v. FPC, 354 F.2d 608 (2d Cir. 1965) and the court's advertence to the affected Hudson river scenery as "finer than the Rhine."

■ That some, or perhaps all, environmental impacts have an esthetic facet, does not mean that all adverse esthetic impacts affect environment. That is neither good logic nor good law. Some questions of esthetics do not seem to lend themselves to the detailed analysis required under NEPA for a § 102(C) impact statement. Like psychological factors they "are not readily translatable into concrete measuring rods." Hanly v. Kleindienst, *supra*, 471 F.2d at 833 n.10. The difficulty in precisely defining what is beautiful cannot stand in the way of expressions of community choice through zoning regulation. Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). But the difficulties have a bearing on the intention of Congress, and whether it contemplated, for example, a requirement of a detailed "environmental impact statement," and concomitant investigation, because of the possiblity that each new Federal construction would be ugly to some, or even most, beholders, on such issues as: Is this proposed building beautiful?[6] Or, what is the esthetic effect of placing the "controversial" Picasso statute in front of the Civic Center building in Chicago? These types of problems lead us to conclude that a "substantial inquiry" or "hard look" was

---

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

5. The concern in this case should be distinguished from aesthetic questions pertaining to use of recreation areas, see Citizens for Reid State Park v. Laird, 336 F.Supp. 783 (S.D.Me.1972) (claim that NEPA statement should be filed in connection with "Operation Snowy Beach", a mock Navy-Marines landing on the beaches of Reid State Park in Georgetown, Maine), and from the inter-

ference with an unencumbered view of an attractive scenic expanse, see Goose Hollow Foothills League v. Romney, 334 F.Supp. 877 (D.Or.1971) (high rise buildings in low rise area will interfere with view of mountains). In our case the view is not an attraction; people are not likely to drive on the high speed Beltway to look at an industrial park.

6. *Cf.* J. Dukeminier, Jr., Zoning for Aesthetic Objectives: A Reappraisal, 20 Law & Contemp.Probs. 218 (1955).

not contemplated, as a matter of reasonable construction of NEPA, where the claim of NEPA application is focused on alleged esthetic impact and the matters at hand pertain essentially to issues of individual and potentially diverse tastes. *See* Natural Resources Defense Council v. Morton, 148 U.S.App.D.C. 5, 458 F.2d, 827 (1972).

 In the instant case, the "assessment" of the Corps of Engineers ultimately dealt with the esthetic question by increasing the landscaping plans and budget, after it was decided that continued siting on the I–3 zone was required. Given the commitment to landscaping, to enhance the appearance of the Facility to those passing by on the Beltway, the Corps felt no further investigation of this matter was required. Given the limited scope of judicial review of such matters, our inability to discern the value or contours of further investigation, we cannot forecast as at all likely the possibility that plaintiff will prevail in showing that it was arbitrary or capricious, or contrary to the requirement of NEPA, to decline to write a detailed impact statement on the esthetic aspect of the project.[7]

### C: *NEPA and Matters Pertaining to Health and Natural Resources*

 There were, however, more significant environmental effects relating to both health and injury to natural resources, that had to be taken into account by the Corps in its decision not to file an impact statement. These problems related to storm water run-off, oil run-off from the parking lot, and traffic. They were the basic matter of two studies of Giffels Associates, and a constant subject of review of NCPC, originally raised by MNCPC in its consulting role in 1970.

Problems of this description would ordinarily call into play an environmental impact statement requirement. This could only be obviated, we believe, by a showing that the potential damage to river ecology, to health by floods, and to the air we breathe, was curtailed by modification of the project design. The water run-off was to be solved by the incorporation of "a controlled run-off system based on the ponding of rain water on the roof." The use of the "California Control package" and testing by the Post Office of their vehicles was the plan by which air pollution was to be minimized. There was, however, no final plan for solving the oil run-off problem.

 What should be the approach of the Court to an "assessment" in which an environmental impact is identified but not thought to require an impact statement, because the impact itself can be controlled by a change in the mission? We believe that an "assessment" statement must provide convincing reasons why a construction project with "arguably" potentially significant environmental impact does not require a detailed impact statement. In this sense we agree with both the majority and the dissent in *Hanley II, supra.* We agree with Judge Friendly's dissent that in cases of "true insignificance" an impact statement is not required, and, thus when there are "arguably" cases of true significance, an impact statement is required. 471 F.2d at 837. On the other hand, we can rely on a review of the record, here consisting of the "assessment" as supplemented by other submissions to NCPC, to determine whether

---

7. We agree, however, with the Fifth Circuit, Save Our Ten Acres v. Kreger, 472 F.2d 463 (1973), that NEPA requires a full review of agency action, whether this be phrased in terms of the statutory formulation of the APA, "arbitrary and capricious" or in terms of "substantial inquiry" as used by the Supreme Court in Citizens To Preserve Overton Park, *supra.* Agency decisions in the environmental area touch "on fundamental personal interests in life, health, and liberty. These interests have always had a special claim to judicial protection." Environmental Defense Fund v. Ruckelshaus, 142 U.S.App.D.C. 74, 88, 439 F.2d 584, 598 (1971), *accord* SIPI v. AEC, 156 U.S.App.D.C. 395, 481 F.2d 1079 (Filed June 12, 1973).

the agency has supplied convincing reasons why potential impacts are truly insignificant. *See Hanley II,* Opinion of Mansfield, J., at 832–833.

There are a number of criteria that can be used by a court to make such a determination. First, did the agency take a "hard look" at the problem, as opposed to bald conclusions, unaided by preliminary investigation? On the record before us we believe this condition satisfied by two rather complete studies, by Giffels Associates and the Corps of Engineers. Second, did the agency identify the relevant areas of environmental concern? Here, the three significant environmental problems, water and oil run-off, and increased traffic, were the focus of discussion between the Postal Service and NCPC, as well as review by Giffels.[8] Appellants have raised no environmental concerns which were not the subject of such considerations.[9] We note that in *Hanley II* the majority remanded to the agency to consider factors not adequately identified or investigated in its 25 page "assessment." 471 F.2d at 834. Third, as to problems studied and identified, does the agency make a convincing case that the impact is insignificant?[10] On our

facts, we would characterize the position of the agency as admitting the true "significance" of potential impacts.

The agency has presented a justification for omitting an impact statement which presents, at least as to water runoff, an issue involving what we may term the fourth criterion: If there is impact of true "significance" has the agency convincingly established that changes in the project have sufficiently minimized it?[11] It is only because of differences in timing and particular focus that this is identified as a separate criterion, for in the last analysis changes in the project are not legally adequate to avoid an impact statement unless they permit a determination that such impact as remains, after the change, is not "significant."

We have already made it clear that in cases involving genuine issues as to health, and environmental resources, there is a relatively low threshold for impact statements, and that an agency that relies on an "assessment" to dispense with an impact statement may well run risks not warranted by any countervailing benefits.

In the case before us, looking first at the problem of water run-off, we have

8. The failure to identify relevant environmental concerns has led to two remands in the office building-jail case in New York City, Hanly v. Mitchell (I), 460 F.2d 640 (2d Cir. 1972), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972), Hanly v. Mitchell (II), *supra.* Other courts, where confident that omissions are truly significant, have required an impact statement. *See* Hiram Clarke Civic Club, *supra,* no environmental factors raised not considered by HUD, slip Opin. at 10 and statement not required. Compare Scherr v. Volpe, 466 F.2d 1027 (7th Cir. 1972), NEPA statement required where agency supplied nothing in writing assessing need for statement; *accord* Ely v. Velde, *supra.*

9. We do not reach the question as to whether appellants can raise questions on appeal from an agency, where not raised before that agency, assuming adequate notice. *See* Gage v. AEC, 156 U.S.App.D.C. 231, 479 F.2d 1214 (Filed May 23, 1973), for an examination of the "exhaustion" problem.

10. This burden should rest on the Government, both because of the high value placed on the protection of the environment by the National Environmental Policy Act of 1969, and because of the risk of error which results from not writing an impact statement on a project requiring one. *See* International Harvester v. Ruckelshaus, 155 U.S. App.D.C. 411, 478 F.2d 615 (Filed February 10, 1973).

11. Certainly a consequence of the potential impact requirements may be to have agencies redesign the project so as to minimize impact. In some cases, such as in construction of highways, *see* Scherr v. Volpe, *supra,* or in stream channelization, *see* Natural Resources Defense Council, Inc. v. Grant, 341 F.Supp. 356 (E.D.N.C.1972), such modifications may not be able to lower impact below the threshold NEPA level. On the other hand, in cases of building siting, where local zoning is complied with, the incremental environmental damage may be more successfully minimized, and this possibility is to be encouraged.

no findings before us by the District Court on this matter, and we note the on-going concern evidenced by NCPC in its "requests" to the Postal Service, that more be done about this problem.

As to the oil run-off, the position of the agency is not that the problem has been solved, but rather that it cannot be. However, an inability to solve the problem would not justify failure to write a detailed impact statement concerning effect on environment, if there are significant effects on environment.[12] The policies of NEPA partly rest on informing Congress and the public about potential environmental effects, as well as exploring alternatives to the action which might lead to less environmental impact. Natural Resources Defense Council v. Morton, *supra*.

If we had to decide this case on the merits on the record before us, we would be hard put to avoid a ruling that the requisite impact statement had erroneously been bypassed. As to water run-off, it is difficult to say that the agency has shown that the project changes have left the environmental effects devoid of significance. As to oil run-off, it does not appear that the agency has asserted that the problem is devoid of significance.

What counsels prudence on our part, however, is the fact that the record before us is one made up on an application for temporary injunction. It is traditional that appeals from the granting or denial of a temporary injunction generally involve matters of discretion with which an appellate court should hesitate to interfere. This is subject to an overriding doctrine that where the case has such a shape that it is governed by doctrines of law that the appellate court can reasonably identify, it should not hesitate to set forth the applicable legal principles merely because the application for permanent injunction has not been formally determined. Delaware & Hudson Ry. Co. v. United Transportation Union, 146 U.S.App.D.C. 142, 158, 450 F.2d 603, 619 (1971).

The difficulty with the case before us lies, in part, in the reality that the NEPA issues have not been adequately focused by the parties and the trial court. This opinion sets forth our heft of the record as gleaned from the papers before us, but this is sketchy and has not been tested in the crucible of a trial. Even though we have identified the drift of our legal impressions, we hesitate to crystallize them into a mandate on this sketchy basis. Accordingly, we refrain from either affirming or reversing the District Court's denying of a preliminary injunction, and we remand for further investigation by that Court, using whatever procedures are required.[13] *See* Citizens To Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). At the end of the road, unless the problems of water run-off and oil run-off can be determined to lack "significance" perhaps as a result of project modification, a full impact statement under 102(C) would seem to be indicated.[14] The assessment

---

12. We do not know whether the oil run-off problem is incapable of solution, or whether this is a matter of cost, which could be considered by the District Court in setting conditions for denial of an injunction.

If the oil run-off problem cannot be avoided *and*, if, accordingly, there is substantial impact on the environment, an impact statement is required. On the other hand, the problem may turn out simply to be one of relative costs as to which the District Court will direct an inquiry. Perhaps it will be developed that, in fact, there is really no significant impact on environment. As our text suggests, our present record is inadequate.

13. In the absence of detailed findings from the agency, a trial-type exploration of these issues may be necessary in the District Court. *See* Citizens To Preserve Overton Park, 401 U.S. at 420, 91 S.Ct. 814. On remand, Citizens To Preserve Overton Park, Inc. v. Volpe, 335 F.Supp. 873 (W.D.Tenn. 1972), the District Court devised the following procedures to supplement the administrative record: (1) discovery, (2) expert testimony, and (3) a plenary hearing, consuming 25 trial days, numerous exhibits and extensive post trial briefing.

14. We cannot agree with plaintiff's claim that the Postal Service is in violation of its

of probability of success that governs decisions on preliminary injunction would be affected by like consideration.

### D. *Irreparable Injury and Remedies.*

A disturbing feature of this litigation arises in the context of making a determination of the consequences to the environment of not granting a preliminary injunction at this time. The building is already substantially complete. There are two explanations for this. First, at least from the record before us, the Postal Service went ahead with this project on I-3 zoning in the face of express disapproval from NCPC. It was only in mid-1972, after the first two phases of this project had been let out for construction, that NCPC approved the site boundaries. The Postal Service is not obligated by statute to follow the advice or recommendations of NCPC, but it is required to wait for those recommendations before starting construction. We are not sure this was done since NCPC based its input on the assumption that I-3 zoning would be abandoned, when in fact it was not.

On the other hand, MNCPC did not bring this litigation until late 1972 when the building was in an advanced stage of construction. To some extent this is understandable, since it might have been expected that the negotiations between NCPC and the Postal Service would result in a change of design, or boundaries, to solve anticipated adverse environmental effects. We remain troubled, however, by indications that the main concern, the "over-riding issue," of MNCPC is "social and economic" rather than "environmental."

In any event, we must face the reality that the building was substantially complete as of May 1973. It may be, therefore, that the only way that we could act to avoid potential damage to the environment would be to order that the building be dismantled, an extreme step to be taken by a court of equity, and a step only remotely possible or conceivable even if we had a full and adequate impact statement before us to review. *See* City of New York v. United States 4 E.R.C. 1646 (3-judge court 1972); *compare* EDF v. Corps of Engineers (Gillham Dam), 470 F.2d 289 (8th Cir. 1972). On the other hand, upon further consideration of this matter the district court may want stipulations on design modifications as a condition for not enjoining the project on the basis of the failure to write a detailed impact statement.

[23] Equitable remedies depend not only on a determination of legal rights and wrongs, but on such matters as laches, good (or bad) faith, and most important an appraisal of the public interest. Virginian Ry., v. System Federation No. 40, 300 U.S. 515, 550, 57 S.Ct. 592, 81 L.Ed. 789 (1937). At present, the facts of this project are somewhat muddled, and there are cross-currents of equity. It may be that on remand the District Court can fashion a suitable decree, perhaps with the consent of the parties, by devising conditions for the project that ameliorate the run-off problems, even though it cannot technically be said they are devoid of all "signifi-

own regulations by the failure to file an impact statement. Although the December 6, 1971 Draft Proposed Guidelines of the Corps of Engineers Postal Support Action, provided that "In the National Capital Region (NCR), a draft environmental statement must be prepared for all projects regardless of the significance of the environmental effect," (JA at 57). This policy is not required by NEPA, and from affidavits in the record seems to have been issued on the understanding that this was the policy of the National Capital Planning Commission, a policy subsequently changed. The change in the guidelines were to be formalized when the final guidelines were published. Affidavit of Major James W. Van Loeben Sels, Deputy District Engineer, Army Corps of Engineers.

cance," and arrive at a disposition that best serves the public interest.[15]

## III. DISPOSITION

In conclusion, we do not disturb the denial of preliminary injunctive relief, because we cannot be sure that the District Court abused its discretion in concluding that ultimately this project would not require the writing of such statement, and because we do not see how a preliminary injunction at this time could be useful. However, we remand this case to the District Court so that reconsideration may be given to whether the potential problems of water and oil run-off lead to the conclusion that an impact statement is required. The District Court is requested to consider whether any continued denial of injunctive relief may not equitably be conjoined with conditions more protective of the environment, perhaps embodying such an approach in the final order.

We have no doubt that upon a record so supplemented the District Judge can exercise an informed discretion and achieve a well-fashioned decree amply protecting the respective parties and can proceed with all feasible expedition.

So ordered.

15. We do not contemplate that a court demand the impossible. But sometimes an agency or consultant says that a solution is "impossible" when it would be more accurate to say that a solution would be imperfect and expensive. It may be that the equity court's optimum disposition and conditions will saddle the project with higher capital costs than would have been required if an impact statement had been forthrightly prepared in the first instance. That would not necessarily be contrary to the public interest if there is taken into account the public interest in an ungrudging application of NEPA's provisions.

\* Mobil Oil Corp. v. Federal Power Commission, No. 71-1836;
Gulf Oil Corp. v. Federal Power Commission, No. 71-1911;
Sohio Petroleum Co. v. Federal Power Commission, No. 71-1913;