**Ralph NADER et al., Plaintiffs,**

v.

**Alexander P. BUTTERFIELD, Administrator, Federal Aviation Administration, Defendant.**

**Civ. A. No. 1967-73.**

United States District Court,
District of Columbia.

Feb. 27, 1974.

Reuben B. Robertson, III, Alan B. Morrison, Washington, D. C., for plaintiffs.

Robert S. Rankin, Asst. U. S. Atty., United States District Court, Washington, D. C., for defendant.

## MEMORANDUM OPINION

PARKER, District Judge.

In this proceeding plaintiffs, Ralph Nader and the Aviation Consumer Action Project, seek declaratory and injunctive relief against the Administrator of the Federal Aviation Administration (FAA). At issue is the legality of action taken by the FAA on March 29, 1973 when it, in effect, approved a policy permitting the airlines to use certain x-ray devices in airport terminal areas for the inspection of passengers' carry-on baggage. Ralph Nader alleges that he is a frequent airline passenger. Aviation Consumer Action Project is a nonprofit organization engaged in the advocacy of passenger and employee safety on airlines and the complaint alleges that many of its supporters are frequent patrons and employees of the airlines.

The plaintiffs have moved for summary judgment and advance two contentions. First, they assert that the rule-making requirements of the Administrative Procedure Act, (APA), 5 U.S.C. § 553 were not observed. They also contend that the inspection policy permitting airlines to use x-ray procedures in their security programs significantly affect the human environment and neces-

sarily require the preparation of an environmental impact statement under § 102 of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332.

A cross motion for summary judgment has been filed and the defendant contends that the Administrative Procedure Act and the National Environmental Policy Act are not applicable to its action.

Upon the basis of the memoranda of points and authorities, affidavits and the entire record submitted by the parties, the Court grants summary judgment for the plaintiffs and denies the motion of the defendant.

The determinative facts are not disputed and may be briefly stated. Faced with the serious problems of hijacking and bomb threats, the FAA, in September of 1971, issued notice of proposed rulemaking for airline security regulations.[1] This resulted in the establishment of various requirements for aircraft and airport security.[2]

Throughout 1972, however, there was an alarming rash of bomb threats and airplane seizures causing the FAA Administrator on December 5, 1972 to declare an emergency situation. Immediately thereafter the security regulations were amended to require that all carry-on baggage be inspected to detect weapons and explosives and that all passengers be cleared or screened by a metal detection device.

Announcement of this policy was contained in a telegram dated December 5, 1972, from the FAA Administrator to the Regional Directors of the Agency. The amendment provided that: carry-on baggage would be inspected to detect weapons or dangerous objects; each passenger would be cleared by a hand-held or a walk-through detection unit or, in the absence of a detector, each passenger would be compelled to submit to a consent search prior to boarding. Plaintiffs do not challenge the overall security program adopted by FAA or the requirements imposed by the December 5, 1972 emergency order. Solely at issue is a subsequent memorandum of March 29, 1973 from FAA's Director of Air Transportation Security to the regional offices prescribing criteria and standards to be satisfied before any x-ray system or equipment could be used for baggage inspection. This was the first reference by the FAA for the utilization of such devices and the Court has not been apprised of, nor does the record refer to, any earlier FAA action which specifically authorized this procedure. The APA and NEPA issues presented are concerned with the March 29th memorandum, which the plaintiffs contend permitted an unauthorized and improper introduction of the x-ray detection systems by the airlines.

### Applicability Of The Administrative Procedure Act

The heart of the APA rulemaking scheme provides for advance general notice of proposals to the public through publication in the Federal Register; opportunity for interested persons to participate and to present views for consideration by the agency; a statement by the agency as to the basis and purpose of the rule; and publication of the rule in the Federal Register by the Agency before its effective date. Section 551(4) of APA defines, in part, a "rule" as

" . . . the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ."

Section 553(b)(A) of the APA provides that, except when notice or hear-

---

1. 36 Fed.Reg. 19173, Sept. 30, 1971.

2. The present regulations appear at 14 C.F.R. § 121.538. Certified airlines were required to file a security program to prevent passengers from carrying weapons or bombs upon aircraft.

ing is required by statute, rulemaking does not apply

"to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice . . . ."

The defendant argues that this exception applies to its action and that the FAA's memorandum of March 29, 1973 was merely a statement providing substantive policy guidance to field employees before permitting air carriers to use x-ray devices. It is claimed that the memorandum was not mandatory and no carrier was required to adopt an x-ray inspection system but rather could make its own decision to inaugurate such procedure.

■ The Court does not view the March 29th memorandum, as the defendant argues, a general statement of policy, and rejects this contention. Before that date air carriers were required to conduct a physical visual search of all carry-on baggage. The new directive, however, marked a significant departure from the prior requirements, and, in effect cleared the way for airlines to eliminate the previously observed safety practices of physical visual hand baggage searches in favor of x-ray systems which met certain FAA criteria. A carrier demonstrating that its equipment met these standards could then amend its procedures. This created a right which had not existed prior to March 29th and the Court does not view this change as a general statement of policy.

General statements of policy under § 553(b)(A) encompass agency action which does not impose or alter rights or obligations of affected persons, Texaco Inc. v. Federal Power Commission, 412 F.2d 740, 744 (3rd Cir. 1969). Moreover a decision as to the applicability of rulemaking must be based upon the substance and effect of the action and not the label or the designation which the agency has chosen. As Circuit Judge Oakes observed in Lewis-Mota v. Secretary of Labor, 469 F.2d 478, 481–482 (2d Cir. 1972):

"While the Secretary strenuously argues that he was merely announcing 'a general statement of agency procedure or practice' . . . , the label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact."

See also National Motor Freight Traffic Association v. United States, 268 F. Supp. 90 (D.D.C.1967).

The opening paragraph of the March 29th memorandum states its purpose:

"The criteria contained in this letter is furnished for guidance in approving amended airline security programs to include the use of x-ray systems for hand-carried luggage/items inspection."

While the memorandum may be viewed as an instructive communication to FAA personnel, which on its face neither creates an official public policy nor establishes direct obligations or rights to air carriers or any other members of the public, it is rather obvious that the policy of allowing x-ray devices was either actually in existence on March 29, 1973 or was only then conceived. Intra agency guidelines, as the government has described this memorandum, are simply not issued in a vacuum to complement non-existent policies or programs. If no other official action had been taken which authorized the use of x-rays, it is reasonable to assume that the questioned guidelines incorporated, by implication, such authorization. The fact that the only government action on this subject takes the form of an internal memorandum does not dispense with the central issue of whether the practice established is subject to rulemaking. If the underlying policy requires adherence to the APA, those requirements cannot be circumvented by FAA's failure to formally promulgate its position.

As the Court views the government's pleadings no claim is made that the x-ray inspection, as opposed to the physical visual approach, was a necessary

emergency precaution. Nader v. Federal Aviation Administration, 142 U.S. App.D.C. 264, 440 F.2d 292 (1971). The FAA has not established that the December 5th order contemplated the utilization of x-rays and the record does not indicate that the non-mechanized method of hand baggage inspection failed to provide adequate security.[3]

Although the use of x-rays has not been mandatory,[4] it is clear that airlines now have available to them certain procedures which they had not been previously afforded and individuals, most notably of course employees operating the machines and the air-travelling public, are now subject to potential hazards due to a practice which has generated public concern.[5]

The Court finds that the policy embodied or implied in the letter of March 29, 1973 sufficiently bears upon the rights and obligations of affected persons to be governed by the rulemaking provisions of the APA. Such procedure not having been followed, and there being no satisfactory reason for exempting the action of the FAA, said policy must be declared an unlawful act is therefore set aside.

### National Environmental Policy Act

Although the practice has been invalidated on APA grounds, the NEPA issues have been squarely presented and, as a matter of judicial economy and efficiency, should be resolved.

Before embarking upon any "major Federal Action significantly affecting the quality of human environment" federal agencies are required under NEPA to prepare a detailed environmental impact statement (EIS or impact statement) setting forth the potential effects of the proposed action as well as alternative measures designed to mitigate any such detrimental ramifications. While these procedures have been held to command strict adherence, Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971), each time the federal government acts an impact statement is not necessarily required. Maryland-National Capital Park and Planning Commission v. United States Postal Service, 487 F.2d 1029, 1039 (D.C.Cir.1973); Hanly v. Kleindienst II, 471 F.2d 823 (2d Cir. 1972). In *Maryland-National Capital Park and Planning Commission*, Judge Leventhal ruled that when the government has identified some environmental impact, but has nevertheless concluded that an EIS is not required, the agency must furnish an "assessment" statement setting forth

" . . . convincing reasons why a . . . project with 'arguably' potentially significant environmental impact does not require a detailed impact statement. In this sense we agree with both the majority and dissent in Hanly II, *supra*. We agree with Judge Friendly's dissent that in cases of 'true insignificance' an impact statement is not required, and, thus when there are 'arguably' cases *of true significance, an impact statement is required.*" 487 F.2d at 1039.

---

3. The statement of Albert L. Butler, Chief, Air Operations Security Division refers to long queues of people waiting at some locations during the physical visual search process. It is difficult to conceive that this situation could be considered as presenting an emergency.

4. In this regard the observation of Circuit Judge McGowan in National Motor Freight Traffic Association, *supra*, are appropriate " . . . and it is no answer to say that it creates no substantive rights because it is provided by the Commission only for those who voluntarily choose to use it. A right to avail oneself of an administrative adjudication of this kind does not become trivial simply because it is optional." 268 F.Supp. at 96.

5. The Food and Drug Administration has studied possible effects of x-ray baggage inspection and has expressed its concern over various hazards. Noting that no Federal standards existed, the FDA, on August 8, 1973 made various recommendations to "assure adequate radiation protection for operators as well as the general public." 38 Fed.Reg. 21442 (Aug. 8, 1973).

The Court cannot accept the proposition that the use of x-ray detection systems, albeit for baggage and not people, will have absolutely no effect upon the human environment. In this connection the previously cited [6] statement of the Food and Drug Administration concerning these x-ray systems is relevant and, along with other material proferred by plaintiffs,[7] lead the Court to conclude that at least some environmental impact can be identified.

The gist of the government's position, as gleaned principally from a document titled Statement of Reasons Concerning The Use Of X-Ray Systems to Inspect The Baggage Of Airline Passengers submitted by the Chief of Air Operations Security Division Office of Air Transportation Security, is that any human effects would be so minimal as to allow the FAA to dispense with the preparation of a detailed impact statement.

██ In justifying this stance of NEPA non-applicability, it is incumbent upon the FAA to furnish a statement of rationale which, in accord with *Maryland-National Park and Planning Commission,* can satisfy the Court on three essential points:

1. That the agency took a "hard look" at the situation;

2. That the agency identified all the relevant environmental concerns; and

3. That, after identifying and studying the issues, the FAA has convincingly demonstrated that any impact is not significant. 487 F. 2d at 1029.

The earlier alluded to "Statement of Reasons" submitted by the FAA does not purport to be a "negative impact statement" of the type described in *Maryland-National Park and Planning Commission* and although there is some discussion of radiation dosages and the unlikelihood of any resultant harm,[8] the government, with this submission, has not met its burden and it will be required to supply a more thorough analysis and rationale before the Court can concur in the FAA's determination that an EIS is not required, a task which should not prove to be overly cumbersome or demanding. The Court is by no means intimating that the authorization of x-ray systems, properly promulgated and thoughtfully controlled, will be subject to a full blown NEPA statement. The ruling is simply that the FAA must articulate and present its position to the satisfaction of the controlling law.

---

6. See fn. 5, *supra.*

7. Plaintiffs have filed a report prepared by the Roswell Park Memorial Institute of the New York State Department of Health which indicates that x-ray inspection mechanisms may have harmful effects upon humans, with particular risks to pregnant women and children.

8. This statement makes reference to an FAA report of February, 1972 concerning field tests of x-ray devices. The report does note potential effects upon those in contact with the radiation emissions but its analysis does not appear to satisfy the Maryland National Park and Planning Commission standards.