The **FUND FOR ANIMALS** et al.,
Plaintiffs,

v.

Kent **FRIZZELL** et al., Defendants.

International Ass'n of Game, Fish and Conservation Commissioners,
Intervenors,

State of Minnesota, Amicus Curiae,

State of New Jersey, Amicus Curiae.

Civ. A. No. 75–1597.

United States District Court,
District of Columbia.

Oct. 21, 1975.

Lisbeth K. Godley, Washington, D. C. and John N. Malyska, Newark, New Jersey, for plaintiffs.

Irwin L. Schroeder, Dept. of Justice, Washington, D. C., for defendants.

Paul A. Lenzini and Richard W. Snowdon, Washington, D. C., of counsel, for intervenors.

## MEMORANDUM AND ORDER

JOHN LEWIS SMITH, Jr., District Judge.

Plaintiffs have brought this action contesting recently promulgated regulations which permit the hunting of certain migratory waterfowl, specifically the greater snow goose, the Atlantic brant, the merganser, and the goldeneye duck.[1] They allege violations by the federal defendants of the National Environmental Policy Act of 1969, the Administrative Procedure Act, the Migra-

---

1. Plaintiffs, various organizations concerned with the protection of animals and wildlife, include The Fund for Animals, Defenders of Wildlife, Friends of the Earth, Wildlife Preserves, The Humane Society of the United States, Deer, Ecology, Environment and Resources, and Animal Protection Institute of America. Defendants are the Secretary of the Interior, the Director and the Regional Director of the U.S. Fish and Wildlife Service (federal defendants), and seven intervenors—the States of Louisiana, South Dakota, Virginia, and Washington, the International Association of Game, Fish, and Conservation Commissioners, the National Society for Conservation and Animal Protection, and the National Rifle Association. In addition two States, Minnesota and New Jersey, filed amicus curiae briefs by leave of Court.

The sharp and varied differences between naturalists, hunters, landowners, and wildlife management agencies have come before courts on numerous occasions. *See, e. g., Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920); *Cerritos Gun Club v. Hall,* 96 F.2d 620 (9th Cir. 1938); *United States v. Greenhead, Inc.,* 256 F. Supp. 890 (N.D.Cal.1966). *Cf. Sierra Club v. Morton,* 405 U.S. 727, 741–52, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (Douglas, J., dissenting).

tory Bird Treaty Act, the 1972 Convention for the Protection of Migratory Birds between the United States and Japan, the 1916 Migratory Bird Treaty between the United States and Great Britain, and the stipulated Order in a previous action against the federal defendants, *The Fund for Animals, Inc. v. Morton*, Civ. No. 74–1581 (D.N.J.1974). The matter is before the Court on plaintiffs' Motion for Preliminary Injunction, following denial of an application for a temporary restraining order. Finding an unlikelihood of success on the merits by plaintiffs and after a balancing of the equities, the Court denies plaintiffs' Motion.

I. A Final Environmental Statement (FES) was issued on June 6, 1975 by the U. S. Fish and Wildlife Service (Service) as an overall programmatic statement concerning sport hunting of migratory birds. 40 C.F.R. § 1500.-6(d)(1); 42 U.S.C. § 4332(2)(C). At the time of publication of the FES, the hunting of the greater snow goose (for the first time since 1931) was in the proposal stage; the hunting of the Atlantic brant was uncertain, due to recent years of decline in population. FES at 111. Subsequently, Service air and ground surveys revealed excellent production of both species and forecast the probability of a large fall flight. A proposed season on greater snow geese and Atlantic brant was announced for the Atlantic Flyway, with emergency 48-hour closure provisions included to protect against possible reduced productivity and other adverse conditions. 40 Fed.Reg. 34362–63 (1975). Environmental assessment reports were prepared, discussing the proposed open seasons, the environmental effects of the proposals, and the alternatives considered. In the final regulations the Service noted, "Having reviewed these assessments . . . [Director Greenwalt] concluded that environmental impact statements are not necessary and has signed negative declarations setting forth that conclusion." 40 Fed.Reg.

44711 (1975); *cf.* 40 C.F.R. § 6.25 (negative declarations).

█ It is the opinion of the Court that the environmental assessments comply with 40 C.F.R. §§ 1500.2(b), 1500.-6(c)(i)–(ii) and with the requirements of *Maryland National Capital Park and Planning Comm'n v. U. S. Postal Service*, 159 U.S.App.D.C. 158, 487 F.2d 1029 (1973). In that case, the Court ruled that in an environmental assessment statement an agency had to: 1.) take a "hard look" at the problem, as opposed to setting forth bald conclusions; 2.) identify the relevant areas of environmental concern; and 3.) make a convincing case that environmental impact is insignificant. 487 F.2d at 1039–40. The U. S. Fish and Wildlife Service included each of these elements in its environmental assessments, weighing the pros and cons of hunting the two species and concluding that additional environmental impact statements were unnecessary. The FES and the environmental assessments together constitute sufficient evaluations of the hunting proposal under the National Environmental Policy Act of 1969.

█ II. The proposed regulations for hunting migratory waterfowl were published on August 15, 1975, and required public comments to be submitted by August 25, 1975, 40 Fed.Reg. 34361, 34363 (1975). The abbreviated comment period allegedly was necessitated on the one hand by the need for early final rules for State licensing and regulatory purposes, and on the other hand by the desirability of utilizing the latest possible information on the status of waterfowl. Previous notices had alerted interested parties that the comment period on hunting regulations would be short. 40 Fed.Reg. 17263, 20090, 27943 (1975).

In seeking to take advantage of the most recent data on migratory birds, the Service offered as much time for public comment as feasible. Nor were the hunting regulations fashioned in a vacuum or without any prior public input. The regulations are the product of a

year-long process, including air and ground surveys, data analysis, Flyway Council meetings, Canadian and State wildlife management agencies' recommendations, and review by the Waterfowl Advisory Committee.[2] In addition, five of the seven plaintiff organizations were sent copies of the proposed waterfowl regulations a week before publication, and six of the plaintiffs submitted written comments. The comments of plaintiff Wildlife Preserves, Inc., were published in full along with the Service's reply in the preamble to the final regulations frameworks. 40 Fed.Reg. 41097–99 (1975). The Court finds that the abbreviated comment procedures do not contravene the public participation provisions of the Administrative Procedure Act. 5 U.S.C. § 553(c), (d)(3).

■■ III. The 1972 Convention for the Protection of Migratory Birds between the United States and Japan requires hunting seasons for migratory birds to be set so as "to maintain their *populations in optimum numbers.*" Art. III, ¶ 2.[3] The implementing legislation for the Convention, 16 U.S.C. §§ 703, 704, directs the Secretary of the Interior to consider various factors before determining when and how migratory birds may be killed. These factors include "zones of temperature . . . , distribution, abundance, economic value, breeding habits, and times and lines of migratory flight" of migratory birds. 16 U.S.C. § 704.

While it is not clear whether plaintiffs may sue to enforce the terms of the Convention, see *Edye v. Robertson,* 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798 (1884); 1972 Convention *supra,* Art. VIII, the Court nevertheless finds that the Secretary of the Interior and the Director of the U. S. Fish and Wildlife Service have acted in accord with the Convention. The federal defendants point out that the phrase "population in optimum numbers" is not further clarified in the drafting history of the Convention. Apparently neither contracting party has *expressly* established the optimum number of birds for any of the 189 species protected by the Convention. Rather, the U. S. implementing legislation has listed specific criteria and factors to be considered before allowing any taking of migratory birds. The Service's formulation of hunting regulations has in fact attended to bird population totals by evaluating production estimates, survival projections, waterfowl distribution, habitat conditions, weather developments, and migratory flight patterns. *See* note 2 *supra.* It is well-recognized that hunting is one element among many affecting the size of the individual geese and duck populations. FES at 185. In view of the complex balancing process undertaken to determine the appropriate limits and conditions of migratory bird hunting, an absolute population figure for each species is not technically required under the 1972 Convention.

IV. The 1916 Treaty with Great Britain for the Protection of Migratory Birds, 39 Stat. 1702, provides that, "The season for hunting [migratory birds] shall be . . . restricted to such period not exceeding three and one-half months as the High Contracting Parties may severally deem appropriate and define by law or regulation." Art. II, ¶ 2. The first series of regulations to implement this provision set forth five different waterfowl hunting periods, depending presumably on a State's geographical location and the flight habits of migratory birds. 40 Stat. 1814 (1918).

2. *See* The Story Behind the Waterfowl Regulations, attachment to Defendants' Opposition to Motion for Temporary Restraining Order, Sept. 30, 1975. *See also* The Status of Waterfowl and the 1975 Fall Flight Forecasts (U.S. Fish and Wildlife Service, July 25, 1975). A nine-volume administrative record was filed by the federal defendants, detailing the process of rulemaking for migratory bird hunting.

3. *See* FES, Appendix III. The snow goose, brant, common goldeneye, common merganser, and red-breasted merganser are listed as protected migratory birds in the Annex to the Convention.

For the succeeding 57 years this system of "staggered" hunting seasons has been followed, with each species of migratory waterfowl hunted for up to 107 days per year.

A contemporaneous or long-standing administrative construction of a statute, treaty, or regulation is entitled to great weight. *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L. Ed.2d 616 (1965); *Factor v. Laubenheimer*, 290 U.S. 276, 294–95, 54 S.Ct. 191, 78 L.Ed. 315 (1933). Here, another party to the Treaty, Canada, has also interpreted the 3½ month provision to permit variable time frameworks for different provinces of the country.[4] Since the numerous waterfowl species do not migrate simultaneously—and are not present, for example, in a southern State at the same time as in a northern State—common sense dictates that the 1916 Treaty did not contemplate a single 3½ month hunting season for the entire United States. The 1916 Treaty and implementing legislation authorize flexibility by the Service and the States in establishing season frameworks that may achieve both hunting and bird-protection goals. 1916 Treaty *supra*, Art. II, ¶ 2; 16 U.S.C. § 704.[5]

V. One count in plaintiffs' complaint alleges the federal defendants' non-compliance with a stipulation in a previous action before a New Jersey federal court. In an opinion dated October 7, 1975, Judge Frederick B. Lacey denied plaintiffs' application for a temporary restraining order relative to this matter. *The Fund For Animals, Inc. v. Frizzell*, Civ. No. 75–1721 (D.N.J.1975). Since the case remains pending before Judge Lacey, the Court sua sponte dismisses the third count of plaintiffs' complaint.

VI. The criteria considered in granting preliminary relief are the moving party's likelihood of prevailing on the merits, a showing of irreparable harm, the probability of injury to the opposing party, and the effect of relief upon the public interest. *Virginia Petroleum Jobbers Ass'n v. FPC*, 104 U.S. App.D.C. 106, 259 F.2d 921 (1958). The Court's analysis here has demonstrated the unlikelihood of plaintiffs' success on the merits. Defendants have represented that the 1975–1976 hunting season will result in an insignificant diminution of the populations of the greater snow goose, the Atlantic brant, the merganser, and the goldeneye duck. With reference to injury and the public interest, the intervenors and amici curiae have pointed out in affidavits the economic impact of curtailing the waterfowl hunting season[6] as well as the potential disruption to ongoing State regulatory, recreational, and law enforcement programs. The affidavits also addressed the widespread problems of crop and water resource depredation caused by the various migratory birds. In balancing the equities at stake here, the

4. Interpretation Act, Rev.Stat. of Canada, ch. I–23(7) (1970); Migratory Birds Regulations, Amendment, SOR/75–461, 109 Canada Gazette Part II, p. 2224 (Aug. 13, 1975) (P.C. 1975–1819).

5. Through inadvertence several States selected 1975 sea duck seasons which would have exceeded a 3½ month period. These mistakes are being rectified through Service amendments. Second Affidavit of Lynn A. Greenwalt, Oct. 7, 1975.

6. In Louisiana, for example, the annual economic impact of waterfowl hunting exceeds $11,000,000. $500,000 is produced from duck stamp sales, $125,000 from basic license fees, and $350,000 from Ducks Unlimited for maintenance and development of breeding habitat in Canada. In addition, approximately $3,000,000 is spent to lease and manage waterfowl lands, while waterfowl hunters spend over $6,000,000 in trip expenses. The State Wildlife and Fisheries Commission manages about 670,000 acres of wetlands for waterfowl, requiring expenditure of about $1,340,000 annually. Affidavit of Hugh A. Bateman, Jr., Louisiana Wildlife and Fisheries Commission, Oct. 8, 1975.

The National Rifle Association in its brief cited estimates that over one billion dollars would be spent during an uninterrupted 1975 waterfowl season. Memorandum in Opposition, at 1.

Court concludes that preliminary relief in plaintiffs' favor is inappropriate.

ORDER

Accordingly, upon consideration of plaintiffs' Motion for Preliminary Injunction, the memoranda of points and authorities in support thereof and in opposition thereto, oral argument of counsel having been heard, and for the reasons set forth in this Memorandum, it is by the Court this 21st day of October, 1975

Ordered that plaintiffs' Motion for Preliminary Injunction be, and the same hereby is, denied; and it is further

Ordered that the third count in plaintiffs' complaint be, and the same hereby is, dismissed.