NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES et al., Plaintiffs,

v.

Donald H. RUMSFELD, Secretary of Defense, et al., Defendants.

Civ. A. No. 75–1670.

United States District Court, District of Columbia, Civil Division.

May 14, 1976.

James W. Pressler, Jr., and Patrick J. Christmas, Washington, D. C., for plaintiffs.

Reed L. von Maur, Judge Advocate Gen., Dept. of the Army, Washington, D. C., for defendants.

## MEMORANDUM

GASCH, District Judge

This case involves a challenge to the decision of the Department of Defense to realign certain military operations at the Pueb-

lo Army Depot (PUAD), Pueblo, Colorado. This action of the defendants will result in the loss of approximately 1800 civilian jobs out of a total civilian workforce at PUAD of 2600. Plaintiffs are the National Association of Government Employees (Union), three PUAD employees and union officers, and the Congressional representative for the Third Congressional District of Colorado in which PUAD is geographically located. They seek to enjoin the continued implementation of the realignment alleging that (1) the realignment discriminates against plaintiffs and their putative class on the basis of their national origin (Spanish-American) in violation of the Fifth Amendment and 42 U.S.C. § 1981, and (2) that the defendants have failed to comply with the procedural requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321, *et seq.,* and the Environmental Quality Improvement Act of 1970, 42 U.S.C. § 4371, *et seq.,* in deciding to implement the realignment. Before the Court at this juncture are the defendants' motion to dismiss or in the alternative for summary judgment, and plaintiffs' motion for preliminary injunction. Upon consideration of the entire record herein and the oral argument of counsel, the Court has determined that the defendants are entitled to summary judgment on both the discrimination claim and the environmental claim.

## FACTUAL BACKGROUND

The actions of the defendants which plaintiffs seek to enjoin are of two categories: (1) the realignment of Army missile maintenance and supply operations from PUAD to other military installations and (2) the transfer of the Improved Hawk Missile Conversion Program together with approximately 752 employees from PUAD to Letterkenny Army Depot at Chambersburg, Pennsylvania.

*The Realignment.* The Pueblo Army Depot is one of several supply, maintenance and storage installations under the com-

mand of the Department of the Army's central logistics organization, the Materiel Development and Readiness Command. On November 22, 1974, the Secretary of Defense announced the realignment of PUAD under "Project Concise," a program resulting from the Congressionally mandated reduction in military forces following the conclusion of the war in Vietnam. The Army's missile maintenance program is carried on at five Army depot sites including PUAD. Since the fiscal year 1968 the workload of this program has steadily declined resulting in a substantial under-utilization of Army missile maintenance capability, and a corresponding decline in the supply mission of these depots. The Army developed three alternatives for dealing with the declining workload at PUAD in view of the overall objective of "continued effective logistics support to the Army in the most economical and efficient manner possible." [1] Eventually the Army chose the alternative that transferred the majority of the missile maintenance workload at PUAD to other depots. The Army considered potential personnel unrest as an important factor in its determination but felt that this factor was outweighed by the benefits of the realignment. These benefits included an estimated recurring savings of $18.08 million and an estimated avoidance of one-time costs of $1.15, as compared to one-time phase down costs of approximately $4.96 million. Concurrent with this consideration of the various alternatives proposed for the realignment, the Army prepared an environmental assessment of the realignment. This assessment was derived from a previous assessment of the environmental impact of PUAD as an on going installation on the surrounding region. The assessment concluded that although a "major federal action," a significant environmental impact would not result from the realignment, and that the plan would not be environmentally controversial. Therefore, the Army con-

---

1. The analysis of possible alternatives for dealing with this under-utilization of missile maintenance capability and the basis for the decision to realign PUAD is contained in defend-

ants' Exhibit 7 to their motion to dismiss or for summary judgment, *Project Concise, Case Study and Justification Folder* ("Case Study") (September, 1974).

cluded that an environmental impact statement need not be prepared.

At oral argument counsel for the defendants indicated that the personnel drawdown accompanying this realignment was 72% completed and scheduled for completion in June, 1976, by which time approximately 800 civilian jobs would be eliminated.

*The Improved Hawk Missile Conversion Program.* This program involves the conversion of the outdated basic Hawk Missile to the Improved Hawk Missile System. By its very nature this program will terminate when all of the outdated missiles have been converted. The conversion program is presently being conducted at PUAD. At the time of the realignment decision it was also announced that the Army would complete the conversion program by June 30, 1977. The Army later felt that this schedule was in danger because of work slippage at PUAD. Thus plans were made to transfer the conversion program to the Letterkenny Army Depot in Chambersburg, Pennsylvania. On October 29, 1975, the Army Materiel Command announced that this relocation constituted a transfer of function for affected employees at PUAD. These employees were informed by letter that they could choose to transfer to Pennsylvania and retain their positions. This planned transfer, however, was cancelled as of February 13, 1976. Defendants presently indicate that all Improved Hawk conversion work will remain at PUAD to the extent of workforce capability and that no workload or workforce associated with the conversion program will be transferred from PUAD without the predicate of an environmental impact assessment.

## DISCRIMINATION CLAIM

The focal point of plaintiffs' discrimination claim is that approximately one-half of the PUAD workforce are Spanish-Americans, and that the "realignment" will reduce the total number of Spanish-American civilian employees at PUAD by approximately 850, or by 6.6 percent of the total number of Spanish-American employees of the Army in the United States. This "statistical imbalance," it is argued, constitutes discrimination *per se* on the basis of national origin. The realignment, therefore, plaintiffs argue, violates the equal protection component of the due process clause of the Fifth Amendment, as well as 42 U.S.C. § 1981.

Defendants argue, *inter alia,* that the Court lacks jurisdiction to review the decision of the Secretary of Defense to realign PUAD. Such a matter, it is argued, is committed solely to the discretion of the Secretary by statute:

Subject to section 401 of title 50, the Secretary of Defense shall take appropriate action (including the transfer, reassignment, consolidation, or abolition of any function, power, or duty) to provide more effective, efficient, and economical administration and operation, and to eliminate duplication, in the Department of Defense. . . .

10 U.S.C. § 125(a) (1970). Plaintiffs, it is alleged, do not contest the Secretary's statutory authority to realign PUAD nor do they contend that the decision is not based on a consideration of the relevant factors of administrative and operational effectiveness, efficiency, and economy and the elimination of duplication. Thus the Secretary's decision of November 22, 1974, has a rational basis, is not arbitrary nor capricious, and being a discretionary decision is not subject to further judicial review. As this Court said in *Local 1106, Nat'l Federation of Federal Employees v. Laird,* 318 F.Supp. 153, 155 (D.D.C.1970), "the Government's management functions in the area of national defense are committed to the unreviewable discretion of the executive, leaving the Court without subject matter jurisdiction of plaintiffs' complaint." See also, *Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2445, 37 L.Ed.2d 407, 415 (1973); *Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 539–540, 97 L.Ed. 842, 849–850 (1953).

These cases, however, did not involve claims of discrimination on the basis of national origin. In such a circumstance the Court may arguably have jurisdiction to review a decision of the Secretary. None-

theless, even upon such review the Court is convinced that plaintiffs have failed to state a claim upon which relief can be granted.

▇▇▇ Plaintiffs allege two bases for their discrimination claims: the Fifth Amendment and 42 U.S.C. § 1981. Treating these in reverse order, the Court notes initially that 42 U.S.C. § 1981 was originally enacted as part of the Civil Rights Act of 1866, 14 Stat. 27, designed to enforce the then recently adopted Thirteenth Amendment. As such it is directed solely at racial discrimination. See *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189, 1192 (1968). It is inapplicable to claims of discrimination based upon other grounds. See *Lamont v. Forman Bros.*, 410 F.Supp. 912 (D.D.C. 1976); *Kurylas v. United States Department of Agriculture*, 373 F.Supp. 1072, 1075–1076 (D.D.C.1974), *aff'd without opinion*, 169 U.S.App.D.C. 58, 514 F.2d 894 (D.C. Cir.1975); *Marshall v. Plumbers and Steamfitters, Local Union 60*, 343 F.Supp. 70, 72 (E.D.La.1972). Plaintiffs, having made no allegation of racial discrimination, have not stated a claim under 42 U.S.C. § 1981.

Plaintiffs' Fifth Amendment claim of discrimination is equally deficient. The only basis for this claim is a statistical showing of the impact of the decision to realign on the Spanish-American workforce at PUAD and in the Army as a whole. At no point have plaintiffs challenged the Secretary's statutory authority to take this action. Indeed, as indicated above, this authority is clear. 10 U.S.C. § 125(a). *See also* P.L. No. 93–365, 88 Stat. 406 § 501 (Aug. 5, 1974). Further, plaintiffs have not denied that the realignment action is based on demonstrably legitimate considerations. Thus plaintiffs' claim is based upon a statistical showing of an impact altogether collateral to an action otherwise legitimate.

▇▇▇ The essence of plaintiffs' claim, based solely on this statistical showing, is that they, as Spanish-Americans, have a constitutionally protected right to a government job in preference to non-Spanish-Americans. Plaintiffs' right to be con-sidered for federal employment is independent of and apart from considerations of national origin. Since it is unquestioned that the Army's civilian workforce must be reduced, the thrust of plaintiffs' argument is that the Secretary of Defense must consider the national origin of those persons to be separated so that a statistical balance or quota can be established. Such a consideration in itself would raise a discrimination issue of constitutional proportions. All plaintiffs are entitled to is a decision by the Secretary that is *neutral* on the question of national origin. See *DeFunis v. Odegaard*, 416 U.S. 312, 334, 94 S.Ct. 1704, 1714, 40 L.Ed.2d 164, 179 (1974) (Douglas, J., dissenting). The materials the defendants have submitted with their motion for summary judgment convince the Court that the decision to realign PUAD was based on legitimate factors divorced from any consideration of the national origin of the plaintiffs. The plaintiffs' recital of a "statistical imbalance" is wholly insufficient to contradict this and to state a claim under the Fifth Amendment.

## ENVIRONMENTAL CLAIM

Plaintiffs' original environmental claim challenged the announced transfer of function of the Improved Hawk Missile Conversion Program from PUAD to the Letterkenny Army Depot in Pennsylvania. The Department of the Army has since reversed this transfer decision. Further, the defendants indicate that the original decision was ineffective because it had not been made at the appropriate command level within the Department of the Army.

Now, however, the plaintiffs' environmental claim encompasses the realignment at PUAD. They allege that the defendants' failure to prepare, and consider as part of their decision making process to realign, an environmental impact statement considering certain socio-economic factors, violated the provisions of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.* and the Environmental Quality Improvement Act, 42 U.S.C. § 4371, *et seq.*

In pertinent part NEPA provides that agencies of the Federal Government shall—

(C) include in every recommendation or report on proposals for legislation and *other major Federal actions significantly affecting the quality of the human environment,* a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332 (emphasis added). This section of NEPA thus provides that an environmental impact statement must be drafted if the action proposed 1) is a major Federal action, and 2) significantly affects the quality of human environment.

It is clear that no such statement has been prepared concerning the realignment of PUAD. It is the position of the defendants, however, that although this is a major Federal action, it does *not* significantly affect the quality of the human environment. Therefore, defendants say, no impact statement is required by the statute. This threshold determination was based on an environmental impact assessment prepared as part of the case study of realignment proposals.[2] This assessment was drawn from a more extensive previous assessment of the environmental impact on the Pubelo area of PUAD as an ongoing military installation.[3] The assessment concludes that there are no known negative impacts on the human environment anticipated as a result of the then proposed realignment. To the

contrary it was anticipated that the action would improve the quality of the human environment as the lessened level of activity at PUAD would reduce emissions, noise, etc., then being introduced into the Pueblo area by the installation.

Plaintiffs attack these conclusions arguing that the assessments should have and did not include considerations of socio-economic factors. Plaintiffs' primary concerns are economic; to wit, the increased unemployment in the Pueblo, Colorado area as a result of job losses at PUAD, and the resultant negative effect on the economy as a whole in the community.

 Such considerations, however, are not the primary concern of NEPA. The primary concern is the *physical* environmental resources of the nation. *See* S.Rep. No. 296, 91st Cong., 1st Sess. 4–10 (1969). This is not to say that the effects on socio-economic factors play no role in environmental decisionmaking under the NEPA procedures. *See Chelsea Neighborhood Ass'n v. United States Postal Service,* 516 F.2d 378, 388 (2d Cir. 1975); *Hanly v. Mitchell,* 460 F.2d 640, 647 (2d Cir.), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). Their role however is limited, and is significant only in conjunction with primary environmental impacts. Socio-economic, or secondary effects alone are not protected by NEPA. *See* Council on Environmental Quality Guidelines, 40 C.F.R. § 1500.8(a)(3)(ii) (1975); Department of Defense Environmental Regulations, 32 C.F.R. § 214.7(b)(2) (1975).

 In virtually all cases expressing concern for socio-economic factors there were at least allegations, if not evidence, of a primary impact on physical environmental resources. *See Hanly v. Mitchell, supra* at 647; *McDowell v. Schlesinger,* 404 F.Supp. 221 (W.D.Mo.1975); *Prince George's County, Maryland v. Holloway,* 404 F.Supp. 1181 (D.D.C.1975). Economic impact resulting from Federal action is insufficient to trig-

**2.** Case Study at EA–1.

**3.** *Id.* at M–3.

ger the applicability of NEPA where no impact on primary resources is alleged or otherwise evident. *See Maryland-National Capital Park and Planning Comm'n v. United States Postal Service,* 159 U.S.App.D.C. 158, 487 F.2d 1029, 1037–1038 (1973); *McDowell v. Schlesinger, supra* at 247 n. 37; *Gifford-Hill and Co. v. F.T.C.,* 389 F.Supp. 167, 174 nn. 36–37 (D.D.C.1974), *aff'd* 523 F.2d 730 (D.C.Cir.1975).

In the case at bar there is some dispute amongst the parties as to the degree of economic impact of the realignment. There is, however, no allegation nor indication of any negative impact on the area's ecosystems. The realignment involves no construction, demolition, or commitment of primary environmental resources, but rather it will lessen noise, traffic, and solid waste disposal at facilities which, the Court has been informed, are already under environmental sanction by the State of Colorado.

Plaintiffs can at best claim but a "remote, insubstantial, highly speculative and ephemeral interest in the environment." *Zlotnick v. District of Columbia Redevelopment Land Agency,* 2 Envir.L.R. 20235, 20236 (D.D.C.1972), *aff'd by order,* 494 F.2d 1157 (D.C.Cir.1974). Plaintiffs' socio-economic claims bear no "reasonably substantial relationship to the quality of the environment." *Gifford-Hill, supra* at 174. In such a situation the procedural requirements of NEPA are inapplicable and defendants are entitled to summary judgment as a matter of law.