**METLAKATLA INDIAN COMMUNITY et al., Plaintiffs,**

v.

**Brock ADAMS, Secretary of Transportation, et al., Defendants.**

Civ. A. No. 77–0154.

United States District Court,
District of Columbia,
Civil Division.

Feb. 25, 1977.

Francis J. O'Toole, Jay R. Kraemer and Richard Schifter, Washington, D.C., for plaintiffs.

Gary Randall, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

Plaintiffs in this action seek declaratory and injunctive relief to prevent defendants from taking further steps in the relocation of the U. S. Coast Guard Air Station from Annette Island, Alaska, to Sitka, Alaska. Plaintiffs' specific complaint relates to the removal of certain housing units as a part of the relocation. They assert primarily that defendants have not complied with certain requirements of the National Environmental Policy Act, 42 U.S.C. § 4331 et seq. Defendants, by way of response, have moved for summary judgment.

The Court held an extensive hearing[1] upon plaintiffs' motion for preliminary in-

junction and defendants' motion for summary judgment in the course of which additional evidence has been received. We conclude that defendants must prevail for the reasons hereinafter set forth.

### Factual Background

Plaintiffs are the Metlakatla Indian Community (a community of Indians for whom Annette Island, Alaska, was set aside as a reservation by Congress in 1891) and three members of that community. Annette Island is located 20 miles south of Ketchikan and 200 miles south of Sitka. Federal presence on the Island commenced during World War II and has been continuous since then. The Coast Guard is the lessee of approximately 120 acres from the plaintiff Community.

During 1971, the Coast Guard began serious consideration of the future of Coast Guard operations at Annette Island and possible alternatives. In 1972, the Coast Guard initially proposed the relocation of the Air Station to Sitka due to the Air Station's "lack of a strategic location for the prosecution of SAR [Search Air Rescue] operations throughout Southeast Alaska," and the need of providing better search coverage. During July 1974, the Coast Guard completed an environmental assessment of the impact which the proposed Sitka Air Station would have upon the Sitka area. The assessment concluded that the earlier negative statement was accurate in determining that construction of the Sitka Air Station would not have "any possible adverse effect on the quality of the human environment." Plaintiffs were notified shortly thereafter of this proposal.

Also in 1974, Congress appropriated funds for the first phase of the move—construction of a hangar and other facilities at Sitka.[2] The Coast Guard contacted the mayor of Metlakatla in February 1975, informing him that the Roland Village hous-

---

1. Page references are to the transcript (T.) of the hearing held on February 17, 1977.

2. This construction, costing in excess of $12 million, is now complete. Plaintiffs concede, as

indeed they must, that this complaint does not raise any question concerning the environmental impact of the relocation as regards Sitka. They lack standing to do so. T. 122–23.

ing[3] was to be relocated to Sitka.[4] The mayor responded in May 1975, that the Indians were exercising their option under the Annette air field lease, scheduled to expire in 1978, to allow the Coast Guard to leave the housing foundations and to cap the utilities to safeguard them.

In March 1976, the Coast Guard conferred with plaintiffs regarding plaintiffs' objections to the move. As a result of this meeting, the Coast Guard agreed to prepare an environmental assessment of the impact which the relocation would have upon Annette Island. The assessment investigation continued through April and May 1976. In mid-May 1976, the Coast Guard, with representatives of the Bureau of Indian Affairs, the Office of Economic Adjustment, and the General Services Administration, met with plaintiffs in a series of meetings to discuss the cumulative impact of the preceding Federal departures from Annette, as well as the impact of the planned relocation. Four months later, in September 1976, after a draft environmental assessment had been prepared and reviewed by plaintiffs, the Coast Guard issued its final assessment. The statement concluded that the relocation would have no significant impact on the quality of the environment within NEPA.

The mayor of Metlakatla subsequently, on November 3, 1976, advised the Coast Guard that he would not request the agency to prepare an Environmental Impact Statement (hereinafter referred to as an EIS) relating to the relocation if the Roland Village housing was left on Annette. In response, the Coast Guard indicated a willingness to negotiate regarding these structures. Although plaintiffs had, during the protracted course of the relocation planning, made general inquiries regarding the purchase of Roland Village, no concrete offer of purchase has even yet been made to the Coast Guard.

The Coast Guard on January 3, 1977, contracted to have Roland Village removed, and the contractor was ordered to proceed within 60 days. This lawsuit to prevent the removal of the Roland Village housing was filed on January 28, 1977, and is predicated on the Coast Guard's failure to file an EIS.

### Merits

The specific issues in controversy are (1) whether the Coast Guard had a statutory obligation under NEPA to prepare an EIS relating to the relocation of the Annette Air Station, and (2) whether the environmental assessment by the Coast Guard of the Annette relocation was deficient and inadequate, and hence provided an inadequate basis for the agency's determination that an EIS would not be required.

In pertinent part, NEPA provides that agencies of the Federal Government shall:

(c) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action;

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented;

(iii) alternatives to the proposed action;

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332.

---

**3.** Roland Village is a group of 14 frame buildings. Each building is comprised of four single-family units. These buildings house many of the 315 Coast Guard personnel, including dependents stationed on Annette Island.

**4.** It is important to note that the Coast Guard bachelor officers quarters (with 38 two-man rooms, dining facility, recreation hall, etc.), as well as the F.A.A. housing facility with 32 single-family units, were to remain on Annette Island. The same is true of the aircraft hangar and certain structures connected thereto.

As is apparent, the two primary elements which must be shown as a predicate to the requirement of an EIS are (1) that the action is a major Federal action, and (2) that the action significantly affects the quality of the human environment.

In this case, the Coast Guard has conceded that the relocation is a major Federal action.[5] However, it has concluded in its environmental assessment that the action would not significantly affect the environment and, therefore, asserts that it was not obligated to prepare an EIS.

It is not disputed that the threshold determination concerning the necessity for an EIS lies with the agency. *Hiram Clarke Civil Club v. Lyon*, 476 F.2d 421 (5th Cir. 1973); *Hanly v. Kleindienst*, 471 F.2d 823 (2d Cir. 1972), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

The appropriate standard of judicial review for such a determination is, however, a point of some controversy among the circuits. The Second and Seventh Circuits appear to hold that the appropriate standard is whether the agency decision was "arbitrary and capricious." *Hanly v. Kleindienst, supra* ; *First National Bank of Chicago v. Richardson*, 484 F.2d 1369 (7th Cir. 1973). However, other circuits have indicated that such an agency decision should be measured by a standard of reasonableness. *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314 (8th Cir. 1974); *Wyoming Outdoor Coordinating Council v. Butz*, 484 F.2d 1244 (10th Cir. 1973); *Save Our Ten Acres v. Kreger*, 472 F.2d 463 (5th Cir. 1973). In the application of either standard of review, we reach the same result and for the purpose of this discussion will employ the test of reasonableness.

In reviewing the reasonableness of the procedure employed by the Coast Guard in preparing its environmental assessments and its consequent issuance of the Negative Declaration, we do not need to emphasize plaintiffs' counsel's admission that the real controversy underlying this litigation, *i. e.,*

the so-called "bottom line"[6] concerns the fate of the Roland Village housing.

With regard to the sufficiency of the environmental assessment itself, it is abundantly clear that the Coast Guard has fulfilled its investigatory obligations under NEPA, and hence has acted reasonably in its decision to issue a Negative Declaration of Environmental Impact. The procedure utilized by the Coast Guard in its formulation of this assessment included a two-month environmental and socio-economic investigation, the issuance of a preliminary statement, the solicitation of the views of the Indian Community (many of which were incorporated into the final document), numerous conferences with plaintiffs and representatives of other Government agencies, and ultimately the publication of the final assessment. The claims of the plaintiffs of adverse effects in the physical environment in the form of an unsightly "ghost town" at the abandoned Air Station, the Community's inability to deal with solid wastes, abandoned automobiles, and injury to crab and other marine life in Tamgas Bay are not supported by the record. Furthermore, the *bona fides* of such claims is undercut by plaintiffs' willingness to "settle" if the Roland Village housing is permitted to remain. The conclusion reached by the agency that not only would the relocation *not* have an adverse physical impact upon Annette Island has a reasonable basis in the record as has its finding that the Coast Guard's departure would slightly improve air, water, and noise pollution.[7]

The plaintiffs' complaint lays greater stress on the economic consequences of the Coast Guard departure, *i. e.,* the loss of the Federal presence and its effect on full employment, revenues from Government services, transportation, and future development. The Coast Guard admits that its departure will have a significant adverse socio-economic impact upon Annette

---

**5.** T. 22.

**6.** T. 59.

**7.** Affidavit of Albert D. Grantham (Ex.N, at 4).

Island.[8] The agency asserts, however, and properly so, that this factor alone is not sufficient to "trigger" the requirement of an EIS. See *Maryland-National Park and Planning Commission v. United States Postal Service*, 159 U.S.App.D.C. 158, 487 F.2d 1029, 1037–38 (1973).

Although the legislative history indicates Congressional concern with the "interrelated problems associated with environmental quality,"[9] such as socio-economic impact, the basic thrust of the Act is the management of this nation's physical surroundings and natural resources. As Judge Gasch has recently observed,

> This is not to say that the effects on socio-economic factors play no role in environmental decision making under the NEPA procedures (citations omitted). Their role is however limited, and is significant only in conjunction with primary environmental factors. Socio-economic, or secondary effects alone are not protected by NEPA (citations omitted). *National Association of Government Employees v. Rumsfeld*, 413 F.Supp. 1224, 1229 (D.D.C.1976).

We agree. However, we are not unaware that occasionally the secondary economic effects, through their impact on existing community facilities and through the introduction of new facilities and activities, may be more substantial than the effect on the physical environment itself. See Council on Environmental Quality Guidelines, 40 C.F.R. § 1500.8(3)(ii) (1976).

Typical of these cases was the relocation by the Air Force of approximately 10,000 individuals to Scott Field, Illinois, a primarily agricultural area surrounded by sparsely populated municipalities,[10] and the transfer by the Navy of a major Oceanographic Center employing 1,300 individuals from the Washington metropolitan area to a small Southern town.[11]

The case here considered is not comparable to *McDowell* or *Prince George's County, supra*, and is clearly distinguishable. Rather, it falls in the large group of cases dealing with Federal installation closures and transfers, which have upheld the agency's determination that an EIS was not required. *National Ass'n of Government Employees v. Rumsfeld, supra*; *Breckenridge v. Rumsfeld*, 537 F.2d 864 (6th Cir. 1976), cert. denied, —— U.S. ——, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977); *Prince George's County v. Schlesinger*, C.A. No. 75–590 (D.D.C. November 7, 1975); *IMAGE of Greater San Antonio v. Rumsfeld*, 9 ERC 1183 (W.D. Tex. May 13, 1976). Since the Coast Guard assessment has properly concluded that no adverse physical environmental impact will occur, the claimed adverse socio-economic effects[12] are not a sufficient basis for the requirement of an EIS under NEPA.

To conclude, it appears that plaintiffs have attempted to use NEPA as a vehicle not primarily to protect the physical environment, but rather as a negotiating lever to obtain, without cost, needed housing for the Indian Community. This is evidenced by a number of factors, the most significant of which is a letter from the mayor of Metlakatla to the Coast Guard sent on November 3, 1976, less than three months prior to the filing of this lawsuit, stating that the Indians would withdraw their request for an EIS if the Coast Guard would not remove the 14 buildings of Roland Village

---

8. See footnote 12.

9. H.R.Rep.No.378, 91st Cong., 1st Sess. 3 (1969), *reprinted in* [1969] U.S.Code Cong. & Ad.News 2751, 2753.

10. *McDowell v. Schlesinger*, 404 F.Supp. 221 (W.D.Mo.1975).

11. *Prince George's County, Maryland v. Holloway*, 404 F.Supp. 1181 (D.D.C.1975).

12. Plaintiffs in their submissions neglected to mention a factor which could significantly reduce and offset the adverse economic impact of the relocation. Plaintiffs are presently negotiating with Louisiana Pacific Company which desires to begin a substantial logging and woodworking operation on the southern end of Annette Island which would utilize the facilities left by the Coast Guard. Such an event would presumably provide additional employment for plaintiffs, new lessees for the abandoned Air Station, and a general economic uplift for the Indian Community.

from Annette Island.[13] The NEPA statute was not enacted for such a purpose.

For all of the above, it is our conclusion that plaintiffs have failed to satisfy the requirements for a preliminary injunction as outlined by this Circuit in *Virginia Petroleum Jobbers Ass'n v. Federal Power Commission*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). Plaintiffs' motion is therefore denied.

We further hold that defendants have fully complied with the requirements of NEPA and that plaintiffs have failed to state a claim under NEPA for which relief can be granted. Defendants are entitled to summary judgment as a matter of law.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law.

An Order consistent with the foregoing has been entered this date.

---

**13.** Grantham affidavit, *supra*, Ex. Q.