IMAGE OF GREATER SAN ANTONIO, TEXAS, et al., Plaintiffs-Appellants,

v.

Harold BROWN, Secretary of Defense, et al., Defendants-Appellees.

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, A.F.L., C.I.O., LOCAL 1617, et al., Plaintiffs-Appellants,

v.

Harold BROWN, Secretary of Defense, et al., Defendants-Appellees.

No. 76–2251.

United States Court of Appeals, Fifth Circuit.

March 30, 1978.

Rehearing Denied May 1, 1978.

Warren Weir, San Antonio, Tex., for Image of Greater San Antonio, Texas.

James M. Heidelberg, Jr., San Antonio, Tex., for Local 1617.

John E. Clark, U. S. Atty., Hugh P. Shovlin, Archie Carl Pierce, Asst. U. S. Attys., San Antonio, Tex., for Sec. of Defense.

Before INGRAHAM, GEE and TJOF-LAT, Circuit Judges.

GEE, Circuit Judge:

Plaintiffs Image of Greater San Antonio and American Federation of Government Employees, A.F.L., C.I.O., Local 1617, filed separate suits against the Secretary of Defense and others challenging a proposed reduction in force (RIF) at Kelly Air Force Base. Plaintiffs alleged in their complaints that the Air Force's failure to file an Environmental Impact Statement (EIS) violated the National Environmental Policy Act of 1969 (NEPA) § 102, 42 U.S.C. § 4332 (1970), and that the proposed discharge of a substantial number of Mexican-Americans violated Title VII, 42 U.S.C. § 2000e–2 et seq. (1970). The district judge consolidated the cases. After a hearing on plaintiffs' motion for a preliminary injunction, the district court denied plaintiffs' motion and granted defendants' motion to dismiss.[1] Plaintiffs appeal.

---

1. Defendants' nonspecific motion to dismiss raised both subject-matter jurisdiction and failure to state a claim issues. Although the district court decided that plaintiffs' claims lacked

The facts are not in dispute. The RIF at Kelly AFB was the result of a series of events and decisions originating with the congressional decree that the number of civilian employees within the Department of Defense be reduced by 22,500 in fiscal 1976. Department of Defense Appropriation Authorization Act of 1976, Pub.L.No. 94–106, 89 Stat. 531 (1975). In compliance with the Act, the Secretary of Defense allocated reductions among the Army, Navy and Air Force. Within the Air Force, the Air Force Logistics Command (AFLC) was directed to reduce its manpower by 6,142 employees. The major part of this reduction was achieved by means other than involuntary discharge. In the end only about 2,500 employees had to be fired. Of these, about one-half had been employed at Kelly.

In determining how the cutbacks would be distributed among the five AFLC centers, the Air Force analyzed its mission requirements and compared them with the skills of the civilian employees at the various centers. A "skills imbalance" had developed since 1970 as the Air Force had achieved previously mandated reductions by a combination of natural attrition and a freeze on hiring. Since the flying time of planes for which Kelly AFB had primary maintenance responsibility had been reduced significantly, the Air Force decided that the greatest number of terminations would take place at Kelly. Once that decision was made, the Air Force eliminated those job positions at Kelly which it considered unnecessary. This was done solely on the basis of job classification. The Air Force had no knowledge of the names or identities of the employees in those positions until after the termination decision had been made. Approximately 250 of the employees ultimately discharged refused offers of lateral transfers to other Air Force bases.

## TITLE VII

Plaintiffs contend that the RIF at Kelly AFB violated Title VII because a disproportionate number of Mexican-Americans were discharged. Plaintiffs presented statistical evidence which showed that although 53%[2] of the civilian employees at Kelly were Mexican-Americans, 70.3% of the employees whose positions were eliminated were Mexican-Americans. Plaintiffs also contend that since 84% of all Mexican-American civilian employees within AFLC are employed at Kelly, the elimination of more job positions there than at any other AFLC base necessarily had a disproportionate impact on those employees. The figures presented by plaintiffs are not in dispute.

The veracity of the Air Force's explanation of its action is likewise not at issue. As described above, the final decision of which job positions to eliminate was the last step in a long hike. In essence, the Air Force decided to eliminate these positions because: (1) it was compelled to reduce the civilian workforce; (2) the flight time of C–5 cargo planes and B–52 bombers had been reduced by 282,000 hours in the last year; (3) Kelly AFB had primary responsibility for the maintenance of these planes; and (4) less flying time means less maintenance. The vast majority of jobs eliminat-

merit, he also held that he lacked subject-matter jurisdiction. We thus view his dismissal of the action as based on alternative holdings. Since the district court and the parties have focused on the merits of plaintiffs' claim and since the district court made extensive findings of fact and conclusions of law relative to the merits of plaintiffs' claims, we think it prudent to treat the dismissal as one for failure to state a claim. However, because the district court considered matters outside the pleadings, we must review the dismissal under summary judgment standards. *See* Fed.R.Civ.P. 12(b); *Tuley v. Heyd*, 482 F.2d 590 (5th Cir. 1973).

**2.** Although the parties and the district court treat 53% as the relevant figure, plaintiffs' documentary evidence reveals that before the RIF Mexican-Americans made up 54.1% of the Kelly workforce and that it was only after the RIF that the figure was 53%. Thus the relevant statistic for disproportionate impact purposes is 54.1%, not 53%. This error in no way detracts from plaintiffs' disproportionate-impact showing.

ed at Kelly were in the maintenance division.

■ Plaintiffs rely on *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and assert that they have made out a prima facie case of discrimination prohibited by Title VII. Under *Griggs*, once the plaintiff establishes a prima facie case, whether by statistical evidence or otherwise, the burden shifts to the defendant to come forward with evidence that he acted not out of some form of racial bias but on the basis of a substantial business reason. When the plaintiff's claim goes to *intentional* discrimination, the employer can rebut the prima facie case against him by articulating "some legitimate, non-discriminatory reason" for his action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). When the plaintiff's claim is that regardless of intent or purpose the defendant's action had a disproportionate impact on a minority group protected by Title VII, the employer cannot rebut plaintiff's prima facie case merely by showing that he acted for "some legitimate, non-discriminatory reason." The standard that defendant's rebuttal evidence must meet, as announced in *Griggs*, is more stringent: the employer must come forward with a com-

pelling business interest which justifies his employment practice or decision.[3]

Whether *Griggs* persists in its full scope is a somewhat vexed question. Although recent Supreme Court cases dealing with related issues have referred approvingly to the standards announced in *Griggs*, see *Washington v. Davis*, 426 U.S. 229, 236, 96 S.Ct. 2040, 2046, 48 L.Ed.2d 597 (1976); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 348, 97 S.Ct. 1843, 1861, 52 L.Ed.2d 396 (1977), the actual holdings in those cases make us wonder. In *Davis* the Court held that disproportionate impact, when used as a separate doctrine and not as evidence tending to show purposeful discrimination, does not rise to the level of a constitutional violation. After specifically rejecting any notion that Title VII standards apply in constitutional cases, the Court went on to hold that the test administered to those seeking to become police officers also passed the statutory test.[4] The Court held that the defendant employer had rebutted plaintiff's prima facie case based on disproportionate impact by showing that performance on the test, which measured verbal skills, was related to performance at the police academy. The Court did not think it necessary for defendants to prove that scores on the test were related to actual job performance, a re-

---

**3.** Although the leading Supreme Court cases on disproportionate impact, *Griggs* and *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), have involved employment practices, specifically the use of tests on job applications, the burden-of-proof procedures outlined in *Griggs* seem to apply as well to cases involving a one-shot decision affecting employment. Title VII prohibits discrimination in employment, not just discriminatory hiring practices. 42 U.S.C. § 2000e–2(a). The instant case may be a little unusual in that most one-shot employment decisions will likely be challenged on intentional discrimination rather than on disproportionate impact grounds. The most likely candidate for a one-time employment decision giving rise to a disproportionate impact claim is a significant layoff like the one involved here. However, that situation will usually be controlled by reference to seniority plans, which are given a privileged position under § 703(h) of Title VII. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52

L.Ed.2d 396 (1977). Under *Teamsters* any disproportionate impact resulting from a layoff under a bona fide seniority plan would not violate Title VII.

In the instant case the Air Force reduced its manpower by eliminating job positions on the basis of whether having someone in that position was essential to Air Force operations, not on the basis of the seniority of the person in that position. Although the Air Force has made some reference to provisions allowing an employee whose position has been abolished to "bump" an employee with less seniority out of a position that the first employee is qualified to fill, there is no evidence in the record on appeal as to the *bona fides* of the Air Force seniority plan. Therefore, we do not rest our decision on this basis.

**4.** While the statute was not Title VII, the majority opinion seems to accept the parties' assumption that "standards similar to those obtaining under Title VII had to be satisfied." 426 U.S. at 249, 96 S.Ct. at 2052 (footnote omitted).

quirement clearly established in *Griggs*.[5] The Court similarly did not require proof that performance at the training academy is indicative of performance on the job. Thus, the Court was not relying on a transitive property of relatedness, i. e., (1) test performance is related to academy performance; (2) academy performance is related to job performance; therefore (3) test performance is related to job performance. The Court merely noted that the "advisability of the police recruit training course . . . seem[ed] conceded." 426 U.S. at 250, 96 S.Ct. at 2052.

The only relationship shown to exist between test performance and job performance was through the training program. The Court found it sufficient that the training program was "advisable." Such a tenuous relationship between a test, which concededly had a disproportionate impact on blacks, and job performance seems a long way from satisfying the standards set out in *Griggs*. "Advisability," likewise, seems a far call from "business necessity." An "advisability" standard would have necessarily led to approval of the high-school equivalence and general-intelligence tests struck down in *Griggs*. It is certainly "advisable" for an employer to seek some minimum education and intelligence in the people he hires. *Cf. Davis*, 426 U.S. at 250, 96 S.Ct. at 2052 ("It is also apparent to us . . . that some minimum verbal and communicative skill would be very useful, if not essential, to satisfactory progress in the training regimen.").

Similarly, in *Teamsters* the Court held that a seniority system which perpetuated the effects of prior *intentional* discrimination against minorities did not violate Title VII. Although the holding was grounded in § 703(h) of the Act, which provides special treatment for seniority systems, it too

seems to derogate the broad theme of Griggs: "Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." 401 U.S. at 430, 91 S.Ct. at 853. Nothing we can imagine could retard the "thawing" of the status quo of prior discrimination more than a seniority system in which the rights and privileges of an employee vis-a-vis his co-workers continue to be defined by his race.

We are nonetheless certain that something remains of *Griggs*, something very important. *Griggs* continues to stand soundly for the proposition that an employer cannot require supererogatory qualifications for a job if requiring such superfluous attributes has a disproportionate impact on a protected minority. The employer must have a reason for demanding particular qualifications, and it has to be a good one. This principle applies to all employment decisions, not just to hiring practices or tests.

Here the Air Force's reasons for discharging these employees are of the most compelling type: they are based in economic necessity and sound business sense. An employer cannot run his business properly unless he is able to discharge unnecessary employees. The need for a businessman to minimize costs is obvious. An employer's decision to discharge employees who draw a salary and yet contribute nothing to the product of the business is not the "arbitrary and unnecessary action" prohibited by Title VII and *Griggs*. This is true whether the employees do not contribute because they cannot do the work required of them or because the work that they have been doing is no longer necessary.[6] The district court correctly held that the Air Force rebutted

---

5. Although *Griggs* may be equivocal about some issues, e. g., whether defendant's rebuttal must pass a standard of "business necessity," "manifest relationship to the employment in question," or merely not be "artificial, arbitrary and unnecessary," it is relentless in its stressing of "job-relatedness" as the quintessential element of a valid employment test.

6. Of course, plaintiffs in a Title VII case can overcome such rebuttal evidence by showing that the reasons put forward by the employer are merely a pretext. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The present plaintiffs have not made any allegation of this sort.

any prima facie case plaintiff may have presented.

## NEPA

Before implementing a major federal action which will have a significant effect on the quality of the human environment, a federal agency must prepare an Environmental Impact Statement. 42 U.S.C. § 4332(2)(C). As a result of an informal assessment, the Air Force concluded that no EIS was necessary with respect to this RIF because it would not have a significant effect on the "quality of the human environment" as those terms are used in the statute.

■■■ The initial determination concerning the need for an EIS lies with the agency. 42 U.S.C. § 4332(2)(C). In *Save Our Ten Acres v. Kreger*, 472 F.2d 463 (5th Cir. 1973), this court held that an agency's decision that no EIS is necessary should be reviewed under a standard of reasonableness. However, a court should proceed to a full hearing on the merits only if the plaintiff raises substantial environmental issues. *Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d 421, 425 (5th Cir. 1973).

Plaintiffs presented evidence below tending to show that the discharge of some 1,200 civilian employees from Kelly AFB would have significant socio-economic effects on the discharged employees specifically and on San Antonio generally. Plaintiffs presented no evidence of any significant effects on natural resources. Except for a broad allegation in the complaint that the RIF would have a "profound effect upon the environment, the health and welfare of man, and the natural resources of the greater San Antonio area," plaintiffs have said nothing about effects on the physical environment except that they are not an essential prerequisite to an agency's obligation to prepare an EIS. Thus, the question before this court is whether socioeconomic effects, standing alone, can trigger NEPA's EIS requirement.

■■■ Although the language and legislative history of NEPA are somewhat less than clear,[7] we are convinced that Congress did not intend that a managerial decision to discharge a number of employees would require preparation of an EIS. NEPA was enacted in recognition of the effect that man's activities—his technological advances, industrial expansion, resource exploitation, and urban development—have on the "natural environment." 42 U.S.C. § 4331. The primary concern was with the physical environmental resources of the nation. *National Association of Government Employees v. Rumsfeld*, 413 F.Supp. 1224, 1229 (D.D.C.1976), aff'd sub nom., *National Association of Government Employees v. Brown*, 181 U.S.App.D.C. 199, 556 F.2d 76 (1977).

We do not mean to say that socio-economic effects can never be considered under NEPA. When an action will have a primary impact on the natural environment, secondary socio-economic effects may also be considered. *See, e. g., Hanly v. Mitchell*, 460 F.2d 640 (2d Cir.), *cert. denied*, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972); Council on Environmental Quality Guidelines, 40 C.F.R. § 1500.8(a)(3)(ii) (1975). But when the threshold requirement of a primary impact on the physical environment is missing, socio-economic effects are insufficient to trigger an agency's obligation to prepare an EIS. *Breckinridge v. Rumsfeld*, 537 F.2d 864 (6th Cir. 1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977); *Metlakatla Community v. Adams*, 427 F.Supp. 871 (D.D.C.1977); *National Association of Government Employees v. Rumsfeld*, 418 F.Supp. 1302 (E.D.Pa.1976); *National Association of Government Em-*

---

**7.** As the Second Circuit noted in *Hanley v. Kleindienst*, 471 F.2d 823 (2d Cir. 1972), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973), the language of NEPA "has been characterized as 'opaque' and 'woefully ambiguous.'" 471 F.2d at 825 (footnotes omitted). Compare the use of statutory history in *Breck-*

inridge v. Rumsfeld, 537 F.2d 864 (6th Cir. 1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977), with the interpretation of congressional policy as expressed in the body of the Act in *McDowell v. Schlesinger*, 404 F.Supp. 221 (W.D.Mo.1975).

*ployees v. Rumsfeld,* 413 F.Supp. 1224 (D.D.C.1976), aff'd sub nom., *National Association of Government Employees v. Brown,* 181 U.S.App.D.C. 199, 556 F.2d 76 (1977); *but see McDowell v. Schlesinger,* 404 .F.Supp. 221 (W.D.Mo.1975).[8] Since plaintiffs have come forward with no evidence of a primary impact on the physical environment, as indeed they cannot, the Air Force's decision that no EIS was necessary clearly passes the reasonableness standard of *Save Our Ten Acres, supra.*

Plaintiffs argue on appeal that in deciding that no EIS was necessary the Air Force failed to comply with its own regulations. There is nothing in the record on appeal to indicate that this issue was ever presented to the court below. It is not included in the complaints filed by the plaintiffs, nor is there any reference to it in the trial judge's findings of facts and conclusions of law. Thus, the issue cannot properly be considered by this court. *See D. H. Overmyer Co. v. Loflin,* 440 F.2d 1213 (5th Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971).

AFFIRMED.

---

**8.** To the extent it holds that socio-economic effects standing alone can trigger NEPA, *McDowell* itself stands alone. All other cases we have found have taken the contrary position. *McDowell,* however, is not free from ambiguity. The court in *Breckinridge* read *Mc-* *Dowell* to say that socio-economic effects by themselves are sufficient. 537 F.2d at 867 n.7. *Metlakatla, supra,* seems to read McDowell as involving a primary impact on the physical environment along with extensive adverse socio-economic effects. 427 F.Supp. at 875.