**CONCERNED CITIZENS FOR the 442ND T.A.W., a Missouri not-for-profit corporation, et al., Plaintiffs,**

v.

**Major General Richard BODYCOMBE, Chief of Air Force Reserve, et al., Defendants.**

No. 81 0997 CV W 3.

United States District Court,
W. D. Missouri, W. D.

April 8, 1982.

Gerald H. Rosen, Kansas City, Mo., for plaintiffs.

Mark Zimmerman, Asst. U. S. Atty., Kansas City, Mo., Byron D. Baur, Secretary of the Air Force, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

ELMO B. HUNTER, Senior District Judge.

Plaintiffs[1] filed this suit on November 25, 1981, seeking declaratory and injunctive relief to restrain the defendants[2] (Air Force) from undertaking the deactivation of the 442nd Tactical Airlift Wing (TAW) of the Air Force Reserve. The 442nd TAW is presently located at Richards-Gebaur Air Force Base, in the metropolitan area of Kansas City, Missouri. Plaintiffs allege that the Air Force made the decision to deactivate on or about January 23, 1981, and that in making this decision it failed to comply with the requirements of the National Environmental Policy Act (NEPA) of 1969, 42 U.S.C. § 4321 *et seq.* the Environmental Quality Improvement Act of 1970, 42 U.S.C. § 4371 *et seq.*, and various regulations. Specifically, plaintiffs allege that an environmental assessment (EA) was not prepared prior to the decision and was not, therefore, part of the decision making process; that the action is a major federal action which would significantly affect the quality of human environment in and around the Richards-Gebaur Air Force Base and an Environmental Impact Statement (EIS) should have been prepared; and that the Air Force failed to follow the spirit and provisions of NEPA, the Environmental

---

1. Plaintiffs are a not-for-profit corporation, Concerned Citizens for the 442nd TAW, and Susan K. Sheehan, a resident of Kansas City, Missouri who lives within close proximity of Richards-Gebaur.

2. Defendants are Major General Richard Bodycombe, Chief of Air Force Reserve; Casper Weinberger, Secretary of Defense of the United States; Verne Orr, Secretary of the Air Force of the United States; General Lew Allen, Jr., Chief of Staff of the United States Air Force; the Department of Defense; and the United States Air Force.

Quality Improvement Act, and the Air Force regulations.

Plaintiff requested a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining and restraining the Air Force from continuing with the deactivation pending proper compliance with NEPA, and a court judgment adjudging and declaring defendants actions in the proposed action are in violation of the statutes and regulations. On November 30, 1981, the parties entered a stipulation that for ninety days the Air Force would not transfer or loan any other C–130 planes, thereby eliminating the need for a temporary restraining order or a preliminary injunction.

On March 4, 1982, a trial on the merits was held in this cause.

### The Statute

The National Environmental Policy Act (NEPA) was passed in 1970. It requires, *inter alia*, that

(2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should be implemented.

42 U.S.C. § 4332.

The Department of Defense is not excepted from these provisions. *Jackson County, Missouri v. Jones*, 571 F.2d 1004, 1007 (8th Cir. 1978).

The Council on Environmental Quality has promulgated regulations to implement NEPA. 40 C.F.R. § 1500 *et seq.* (1981). Section 1501.2 of those regulations states that "[a]gencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values . . . ," and sets out other guidelines for assuring the objectives set forth in NEPA are met. The Department of Defense has enacted its own regulations in compliance with the NEPA requirements. 32 C.F.R. § 214 *et seq.* (1981).

Section 1508 of the Council on Environmental Quality regulations defines some of the important terms used in NEPA and the related regulations. Under these definitions, an environmental assessment (EA)

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, or alternatives as required by sec. 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9 (1981).

"Finding of No Significant Impact" [FONSI] means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note

any other environmental documents related to it . . . .

40 C.F.R. § 1508.13 (1981).

In defining the human environment, the regulation specifically states that "economic or social effects are not intended by themselves to require preparation of an environmental statement," although when an EIS is prepared and "economic or social and natural or physical environmental effects are interrelated, then the [EIS] will discuss all of these effects on the human environment." 40 C.F.R. § 1508.14 (1981).

### Facts

According to the testimony and evidence elicited at the trial, in mid-January, 1981, Verne Orr, Secretary of the Air Force, made an announcement of the proposed conversion of the 442nd TAW to a fighter wing. The announcement stated:

The U.S. Air Force announced today that it plans to make aircraft equipage changes at the following Air Force Reserve units beginning late in calendar year 1981:

442d Tactical Airlift Wing (TAW), Richards-Gebaur AFB, Missouri, equipped with 16 C–130es, will be inactivated in late 1982. A tactical fighter group (TAG) will be activated at Richards-Gebaur AFB with 18 A–10s. . . .

Peacetime role of A–10 training for the air reserve forces in late 1981.

The proposed actions are part of the Air Force's continuing effort to modernize the Air Reserve Forces and further enhance their capabilities within the total force policy.

Defendant's Exhibit No. 1.

The environmental assessment (EA), prepared by an independent company, Tetra Tech, Inc., is dated January, 1982. The EA assessed environmental impacts in the areas of solid and chemical waste, sewage and storm water, air quality, biotic environment, socioeconomic environment, noise, and flight safety. It found minor positive impacts relative to waste generation (solid and chemical), sewage treatment, and storm water contamination. As for air quality, the EA found that impacts will be positive with respect to particulates, sulfar dioxide and nitrogen oxides, and slightly negative with respect to carbon monoxide and hydrocarbon emissions. The AE found no significant biotic impacts.

Noise impact calculations indicate that a small reduction in aircraft noise will result from the mission change. Minor changes in flight safety could result due to the higher mishap rate of the A–10A aircraft. The fact that only a small portion of A–10A flying time will be spent in the RGAFB vicinity will mitigate the potential flight safety impacts.

Regarding socioeconomic impacts, the EA indicated that loss of direct and indirect employment, regionally and locally, and declining school enrollment in the area were the most significant impacts. According to the EA, unemployment was expected to increase by less than 0.1 percent regionally, and by less than one percent locally in Belton, Missouri. There would be a slight decrease in regional school enrollments and an almost one percent decrease in Belton enrollment.

The EA recommended a finding of no significant impact. Defendants' Exhibit No. 2 (Environmental Assessment).

There are approximately 1900 personnel associated with the 442nd TAW at Richards-Gebaur. These include 1400 reservists (200 of them full-time reservists), 50 active personnel, approximately 400 civilian employees and 30–35 contract personnel. (Testimony of General William W. Basnett, wing commander of the 442nd TAW).

According to the testimony of General Basnett, the announcement made in January of 1981 was of a *plan*, and a final decision to convert was not made until February 1982, (Defendants' Exhibit No. 4), after the filing of the EA. Any statements in the meantime[3] were just references to

---

**3.** Plaintiffs introduced a newsletter, *Commander's Letter*, dated February 1981, which stated that the 442nd TAW *will* be inactivated in late 1982 and a tactical fighter group *will* be acti-

the plan to convert. A plan is not final and not all plans are carried out. Between January and December 1981, there were no direct actions in implementing the proposed plan, only planning-type actions such as surveys and evaluations. (Testimony of General Basnett).

In an attempt to show that the Air Force began the conversion prior to the filing of the EA, plaintiff presented evidence that three C–103 planes had been "transfered" to Westover Air Force Base. (Plaintiffs' Exhibit No. 2 [4]). General Basnett testified, however, that these "transfers" were merely loans on a temporary basis, and that the planes had been sent because a number of Westover's planes were down for maintenance work. The permanent assignment of the planes remained with the 442nd.

■ The plaintiffs contention seems to be that the decision to convert the 442nd TAW to a fighter group was made prior to an environmental assessment and that the Air Force, therefore, failed to follow its own regulations and the spirit and provisions of NEPA in not considering environmental aspects in the decision making process. Based on the evidence and testimony received at the trial, the Court finds that the Air force correctly considered environmental effects in reaching its decision to convert in that the environmental assessment and finding of no significant impact were completed prior to and considered in the final decision to carry out the proposed plan.

### Environmental Impact Statement

■ The next question before this court is whether an environmental impact statement (EIS) should have been prepared. NEPA requires that an EIS be prepared for all major federal action [5] that will significantly affect the quality of the human environment. 42 U.S.C. § 4332. The standard of this Court's review of the agency decision not to prepare an EIS has been well defined by the Eighth Circuit Court of Appeals.

To upset an agency determination not to prepare an impact statement, it still must be shown that the agency's determination was not reasonable under the circumstances. This will require a showing that the project could substantially affect the quality of the human environment.

*Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1320 (8th Cir. En Banc 1974); *McDowell v. Schlesinger*, 404 F.Supp. 221, 249 (W.D.Mo.1975). Therefore, for a finding in plaintiffs' favor, plaintiffs must show that the project could substantially affect the quality of the human environment. Stated another way, the plaintiff has the burden of raising a substantial environmental issue. If plaintiff meets this burden, the burden shifts to defendant to support the reasonableness of the decision not to prepare an EIS. *Winnebago Tribe v. Ray*, 621 F.2d 269, 271 (8th Cir. 1980), *cert. denied*, 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980).

To establish a substantial environmental issue, the "[p]laintiff must allege facts [omitted from consideration in the administrative record] which, if true, would constitute a 'substantial' impact upon the environment." [citations omitted] The alleged deficiency must be of sufficient significance to warrant shifting the burden of proof.

621 F.2d at 271.

From the evidence presented, plaintiffs' claim of environmental impact seems to

---

vated there. (Plaintiffs' Exhibit No. 1). Gen. Basnett explained, however, that the newsletter is just an informal communication to the officers, not an order. An order is what is needed to set in motion a plan or action. Gen. Basnett also stated that implied in all announcements in the newsletter is pending environmental evaluations. The Court is not persuaded that the newsletter contradicts the other testimony that a final decision was not made until after the EA was filed.

4. Plaintiffs' Exhibit No. 2 was a computer print-out of the Maintenance Status Report which stated "trans" after the identification numbers of three C–130s.

5. The witnesses testimony differed on whether the proposed action was a major federal action. Because the Court finds the action will not substantially affect the quality of human environment, it is not necessary to decide whether the action is major federal action.

center on the alleged impact the ammunition the A–10s will be carrying, the flight safety record of the A–10s, and the number of personnel who will be affected by the conversion.[6]

The Court will address first the alleged environmental impact of the ammunition the A–10s will be carrying. Douglas M. Lord, a member of the 442nd TAW with specialized training in munitions and loading, testified for plaintiffs. He discussed his knowledge of the various munitions an A–10 is equipped to handle. These planes are training planes and will be carrying only practice munitions. For example, they will carry BDU–33 practice bombs, a small bomb weighing approximately 24 pounds. According to Mr. Lord, this practice bomb has a very small explosive device which, on impact, would injure a person within fifteen feet of the bomb. A–10 planes are also equipped to carry Mk–82 practice bombs. This bomb has no explosive device but is filled with concrete and could injure a person or building if dropped directly on them. The planes can also carry 30mm target practice bullets and TGM–65 training missiles (contains no projectile or warhead and cannot be accidentally jettisoned). These munitions will not, however, be used in the Kansas City area but will only be used in the practice areas at Fort Leonard Wood, Missouri, and Smoky Hill, Salina, Kansas.

Under the standard of *Winnebago*, the plaintiff must establish that facts were omitted from the agency consideration which would have a substantial impact on the environment. The Court finds that the plaintiffs did not meet their burden with respect to the alleged potential environmental impact of the munitions. The EA specifically lists the various ammunitions that the A–10s can carry. (Environmental Assessment, p.5, Defendants' Exhibit No. 2). Consideration of these munitions was not omitted from the administrative record. Furthermore, the Court does not believe

that the carrying of the ammunitions will have a substantial impact on the environment in and around Richards-Gebaur, as plaintiffs allege, in that they will not be used in that area and plaintiffs did not show that there was a likelihood that they could be accidently ejected.

Plaintiff also alleges that the A–10 fighter plane is a less safe plane than the C–130, and that this will have a substantial impact on the environment. General Basnett indicated that the A–10, a relatively new plane, had had some problems earlier, but the safety record had improved greatly. In 1981, the A–10 had the safest record in the Air Force. General Basnett also stated that the plane only flies at the lower, more dangerous altitudes at the practice areas in Ft. Leonard Wood and Smoky Hills. The EA considered the safety record of the planes and concluded that a major mishap can be expected on an average of once in six years and that it would actually be lower in the Kansas City area because only a small fraction of the planes' flying time will be spent locally. (EA, p. 38).

Again, the Court finds that the plaintiffs failed to meet their burden under *Winnebago*. The safety record was in the administrative record. In addition, the Court does not believe that this factor will have a substantial impact in the area in and around Richards-Gebaur as plaintiffs allege.

Finally, plaintiffs contend that the action will have a significant impact on the people employed at Richards-Gebaur and the surrounding community in that a number of reservists and civilians will lose their positions or be transferred because of the conversion. There was some disagreement among the witnesses as to how many personnel would actually be without an assignment after the conversion, but such data is irrelevant to a determination of whether an EIS should have been prepared. According to the regulations of the Council on Environmental Quality, as discussed *supra*, eco-

---

**6.** Plaintiffs also presented testimony from some of their witnesses indicating that they did not feel the conversion was necessary or wise. Under NEPA and related statutes and regulations,

this Court has the power to review the agency's decision as it relates to environmental issues. This court is not to substitute its views on the wisdom of the action.

nomic and social effects alone are not sufficient to require the preparation of an EIS. The case law has reflected this also. *Como-Falcon Community Coalition, Inc. v. United States Department of Labor*, 609 F.2d 342, 345–346 (8th Cir. 1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980); *Image of Greater San Antonio v. Brown*, 570 F.2d 517, 522 (5th Cir. 1978); *Breckinridge v. Rumsfeld*, 537 F.2d 864 (6th Cir. 1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977); *National Association of Government Employees v. Rumsfeld*, 418 F.Supp. 1302, 1305 (E.D.Pa. 1976). Therefore, even if the number of personnel who will be affected is 290 (Testimony of Walter H. Oades) or only 20–25 (Testimony of Gen. Basnett [7]) this socioeconomic impact would not alone be sufficient to trigger the requirement of preparation of and EIS.[8]

The Court finds that the plaintiffs failed to meet their burden of showing that the conversion could substantially affect the human environment as required by the Eighth Circuit in *Minnesota Public Interest Research Group v. Butz, supra*, or their burden of raising a substantial environmental issue as required under *Winnebago Tribe v. Ray, supra*. Based on the regulations and case law, mere economic and social impact is not sufficient to require the preparation of an EIS. Therefore, the number of personnel to lose positions, even if significant, does not require the preparation of an EIS. Accordingly, the Court concludes that the defendants have not violated the spirit or provisions of NEPA, the Environmental Quality Improvement Act, or the related regulations.

In light of the above discussion, is is hereby

ORDERED that judgment be entered in favor of defendants.

IT IS SO ORDERED.

---

**7.** Gen. Basnett testified that probably only about 20–25 personnel would be without an assignment. There will be about 200 fewer authorized reservists positions after the conversion. Many of those without positions at Richards-Gebaur after the conversion will be able to find positions elsewhere and some of the reservists are reaching mandatory retirement age.

**8.** The present conversion differs greatly from that which was the subject of an earlier case before this court. In *McDowell v. Schlesinger*, 404 F.Supp. 221 (W.D.Mo.1974), the Air Force proposed that 1049 military personnel and 753 civilian employees located at Richards-Gebaur be relocated to Scott Air Force Base, near St. Louis. This move affected the lives of more than 10,000 persons directly, and indirectly affected the lives of thousands more. There was evidence that the move would directly and substantially affect the physical and economic environment of two major urban areas, including housing shortages, overburdening of local utilities and other public services in the Scott AFB area. There were also unknown environmental impacts caused by the construction of new housing and other community facilities in the Scott area which would need to be built to accommodate the incoming population. The transfer would result in significant impacts to the Richards-Gebaur area on existing social and economic activities and conditions in the area. It would also impact problems relating to law enforcement and fire prevention, growth and development patterns in the area, neighborhood character and cohesiveness, and existing land use patterns. 404 F.Supp. at 254. The action planned in the present case affects far fewer people and there was no evidence to such serious disruption to the community and surrounding environment.